# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 1, 2011          Decided July 22, 2011

No. 10-5117

NAZUL GUL,
APPELLANT

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES OF
AMERICA, ET AL.,
APPELLEES

---

Consolidated with 10-5118

---

Appeals from the United States District Court
for the District of Columbia
(Nos. 1:05-cv-00888, 1:05-cv-01009)

---

*Stephen R. Sady*, Chief Deputy Federal Public Defender, Federal Public Defender for the District of Oregon, argued the cause for appellants. With him on the briefs were *Steven T. Wax*, Federal Public Defender, and *Amy Baggio*, Assistant Federal Public Defender.

*Tony West*, Assistant Attorney General, U.S. Department of Justice, argued the cause for appellees. With him on the

brief were *Robert M. Loeb* and *Benjamin S. Kingsley*, Attorneys.

Before: GINSBURG, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: The United States detained Nazul Gul and Adel Hamad for several years at the Naval Base at Guantanamo Bay. During that time, each filed with the district court a petition for a writ of habeas corpus. Prior to any hearing on the merits of their petitions, however, the United States transferred the detainees to the custody of foreign sovereigns; it did not then rescind, nor has it since rescinded, their designation as "enemy combatants."

In an effort to refute the allegations levied against them and to have that designation rescinded, Gul and Hamad want to continue litigating their habeas petitions. Because they are no longer held by the United States, however, the district court dismissed their petitions as moot and hence beyond the court's jurisdiction under Article III of the Constitution of the United States. Gul and Hamad appeal, arguing among other things that their petitions are not moot because they continue to be burdened by the collateral consequences of their prior detention and continuing designation. Having determined the appellants identify no injury sufficient to bring their cases within the court's jurisdiction under Article III, we affirm the order of the district court.

## I.   Background

Pakistani forces arrested Hamad in Pakistan in 2002; American forces arrested Gul in Afghanistan in 2003. The

United States transferred both men to the Naval Base at Guantanamo Bay.

While detained, each filed in the district court a petition for a writ of habeas corpus seeking his immediate release. There being some doubt about its jurisdiction to hear those petitions, the district court stayed both cases pending resolution of the uncertainty by the Court of Appeals. *See* Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1005(e), 119 Stat. 2680, 2742–43 (codified at 10 U.S.C. § 801 note) (limiting scope of judicial relief available to detainees at Guantanamo Bay and vesting jurisdiction exclusively in D.C. Circuit); Military Commissions Act of 2006, Pub. L. No. 109-366, § 7, 120 Stat. 2600, 2635–36 (amending 28 U.S.C. § 2241(e)) (stripping federal courts of jurisdiction to "consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination").

In 2007, without substantive action having been taken in either case, the United States notified Gul and Hamad they had been "approved to leave Guantanamo." The notice stated approval to leave "does not equate to a determination that [the detainee] is not an enemy combatant, nor is it a determination that he does not pose a threat to the United States."

In accordance with the notice, Gul was transferred to Afghanistan in March 2007, after which the district court sua sponte dismissed his petition as moot. Gul promptly moved for reconsideration of the order of dismissal but his motion was not immediately resolved.

4

Hamad was transferred to Sudan in December 2007. The court took no further action on his petition until 2008, when the Supreme Court issued *Boumediene v. Bush*, 553 U.S. 723.

The district court then consolidated proceedings in all Guantanamo Bay cases and the presiding judge ordered all former detainees who had been transferred out of Guantanamo, but who still had habeas petitions pending, to submit a consolidated brief addressing the issue of mootness. On April 1, 2010, after briefing was complete, the district judge dismissed in a single order all cases captioned in the consolidated brief.[*] *See In re Petitioners Seeking Habeas Corpus Relief In Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 137.

## II. Analysis

Gul and Hamad claim their petitions are not moot and the district court made certain procedural errors in reaching the contrary conclusion. Specifically, they argue the district court (1) misapplied the collateral consequences doctrine, (2) improperly shifted to them the burden of showing their cases present a live controversy, (3) failed adequately to consider the facts of their individual cases, and (4) failed to abide the provision of 28 U.S.C. § 2243 requiring courts to dispose of a habeas petition as "law and justice require." We address de novo these issues of law, *see Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) (question of mootness reviewed de novo), and affirm the order of the district court.

---

[*] In all, two district judges dismissed the petitions of more than 100 former detainees, 15 of whom appealed. We granted the Government's motion to consolidate as to these two cases and held the other 13 in abeyance pending this decision.

A. The Collateral Consequences Doctrine

In arguing for reversal, Gul and Hamad rely first and foremost upon the collateral consequences doctrine. The doctrine dates back at least to *Carafas v. LaVallee*, 391 U.S. 234 (1968), which the Supreme Court heard after a state prisoner, who had petitioned for a writ of habeas corpus, had completed his term of incarceration and been discharged from parole, *id.* at 236. The state argued the Court lacked jurisdiction to hear the petition because the petitioner's release from custody and his subsequent completion of parole terminated any injury caused by his unlawful confinement; his case, that is, was moot. *Id.* at 236–37. The Supreme Court observed that as a "consequence of his conviction, [the petitioner] cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election held in New York State; [and] he cannot serve as a juror." *Id.* at 237 (footnotes omitted). Because of these "disabilities or burdens," the Court held the petitioner had "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Id.* (internal quotation marks omitted).

A few weeks later the Supreme Court determined a former prisoner challenging his conviction should be presumed to present a justiciable case, for it is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences." *Sibron v. New York*, 392 U.S. 40, 55 (1968). A government could rebut this presumption only if it could show there was "no possibility that any collateral legal consequences [would] be imposed on the basis of the challenged conviction." *Id.* at 57.

Gul and Hamad argue a former detainee who remains designated an enemy combatant should likewise be presumed to have a justiciable case. They deem it "obvious" the consequences facing such an individual are tantamount to those facing a person convicted of a crime and, therefore, they disclaim any obligation to identify a specific collateral consequence they face before the district court proceeds with the merits of their claims.

Alternatively, Gul and Hamad argue they have shown they continue to experience concrete adverse consequences from their prior detention. As a result of being designated enemy combatants, they argue: (i) the governments of Afghanistan and Sudan, respectively, have imposed travel restrictions upon them; (ii) they are prohibited from entering the United States; (iii) they are subject under the Laws of War to the possibility of re-arrest, capture, detention, and extrajudicial killing by the United States; and (iv) their reputations have been damaged.

The Government responds by noting it is not yet established whether the collateral consequences doctrine applies to a habeas petition filed by a former detainee. It contends the doctrine is not applicable, and a detainee who is no longer in U.S. custody should be foreclosed from arguing his petition is not moot, because habeas is at its "core" about remedying unlawful detention. The Government offers two arguments to support this position. First, the Government argues the collateral consequences doctrine derives from 28 U.S.C. § 2241 and is therefore not available to a detainee who is, it says, entitled only to those habeas rights protected by the

Suspension Clause of the Constitution.* Second, citing *Munaf v. Geren*, 553 U.S. 674 (2008), the Government points out equitable considerations, particularly principles of comity with foreign sovereigns, may in some circumstances provide legitimate reason to restrict the availability of the writ to current detainees and, by parity of reasoning, to former detainees as well.

Even if a former detainee's habeas petition may present a live controversy, the Government maintains, the present appellants' petitions must be dismissed:  First, it says, a former detainee should not be presumed to face collateral consequences because the types of "disabilities and burdens" identified in *Carafas* and its sequelae do not attend "detainees held under the laws of war."  Second, the Government argues none of the particular consequences by which Gul and Hamad claim to be burdened is sufficient to meet the injury component of the case-or-controversy requirement of Article III.

Assuming without deciding the collateral consequences doctrine applies to a habeas petition filed by a detainee, we agree with the Government that the doctrine does not save from mootness the petitions filed in these cases.

1. No Presumption of Collateral Consequences

The Supreme Court has cautioned against extension of the presumption of collateral consequences.  In *Spencer v. Kemna*, 523 U.S. 1 (1998), a parole violator had been sent back to prison to serve the remainder of his term; he

---

* *But* s*ee Kiyemba v. Obama*, 561 F.3d 509, 512 & n.2 (D.C. Cir. 2009) (rejecting distinction between "core" and "ancillary" habeas rights and holding detainee's habeas petition arises under § 2241).

petitioned for habeas to challenge the revocation of his parole, but he had completed his sentence before the merits of his petition were heard. The Court recognized it had "[i]n recent decades ... been willing to presume that a wrongful criminal conviction has continuing collateral consequences" but, it pointed out, before erecting that presumption it had in a number of cases always:

> required collateral consequences of conviction to be specifically identified, and ... accepted as sufficient to satisfy the case-or-controversy requirement only concrete disadvantages or disabilities that had in fact occurred, that were imminently threatened, or that were imposed as a matter of law ....

*Id.* at 8. Because the Court could not similarly discern whether and to what extent similarly concrete consequences attach to an order revoking parole, it held the presumption should not be applied to a convict who contested such an order. *Id.* at 12 (quoting *Lane v. Williams*, 455 U.S. 624, 632 (1982)). The convict must instead prove revocation of his parole had a continuing consequence "adequate to meet Article III's injury-in-fact requirement." *Id.* at 14.

The Court gave three prudential reasons for its conclusion. First, presuming or accepting "the remote possibility of collateral consequences ... sits uncomfortably beside the long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *Id.* at 10–11 (internal quotation marks omitted). Second, the presumption of collateral consequences had been "developed during an era in which it was thought that the only function of the constitutional requirement of standing was to assure that

concrete adverseness which sharpens the presentation of issues," a view which "has since yielded to the acknowledgement that the constitutional requirement is a means of defining the role assigned to the judiciary in a tripartite allocation of power." *Id.* at 11–12 (internal quotation marks and alterations omitted). And third, it was not clear a presumption of significant collateral consequences from revocation of parole would "comport with reality." *Id.* at 12.

These prudential considerations apply with equal force to the circumstances presented here. The first is, of course, always applicable to a claim that collateral consequences should be presumed rather than proved. As for the second, the Supreme Court was hesitant to extend the presumption to an order revoking parole because the case-or-controversy requirement is a bulwark supporting the separation of powers. As this litigation involves individuals seized on a battlefield and now in the custody of a foreign sovereign, applying the presumption here could infringe upon the domain of the branches of government responsible for the external relations of the Nation. Finally, as to the Court's concern that the presumption not outrun the reality of collateral consequences, we note detention at Guantanamo and designation as an enemy combatant are recent phenomena; we have no basis for inferring they routinely have collateral consequences.

In sum, we cannot merely presume a former detainee faces collateral consequences sufficient to keep his petition from becoming moot upon his release. A former detainee, like an individual challenging his parole, must instead make an actual showing his prior detention or continued designation burdens him with "concrete injuries." *Id.* at 14.

2. The Consequences Identified Are Insufficient

Put to their proof, Gul and Hamad claim to face five concrete consequences because of their prior detention and continued designation.   Bearing in mind that the Judicial Power vested in federal courts by Article III "exists only to redress or otherwise to protect against injury to the complaining party," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), we cannot agree with the appellants:  As we explain below, either the court cannot redress the particular harms Gul and Hamad allege or such harms are too speculative to sustain the exercise of federal jurisdiction.  *See Spencer*, 523 U.S. at 14–16 (rejecting alleged collateral consequences of parole revocation because not concrete, "attributable" to revocation, or redressable by habeas: "as to the possibility that the parole revocation could be used directly against petitioner should he be the object of a criminal prosecution, it is at least as likely that the conduct underlying the revocation, rather than the revocation itself ... would be used").

a.  Travel Restrictions

Gul and Hamad claim that because they remain designated enemy combatants, the Afghan and Sudanese Governments have restricted their ability to travel either by refusing them passports or by monitoring their movements. Assuming these allegations are true, the harm does not meet the case-or-controversy requirement because it is caused not by a party before the court but by a stranger to the case, and is therefore beyond the power of the court to redress.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–43 (1976) (the case-or-controversy limitation of Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that

results from the independent action of some third party not before the court").

The Government has submitted declarations explaining that when a detainee is transferred out of Guantanamo, he is "transferred entirely to the custody and control of the [receiving] government." We credit that declaration.[*] *Kiyemba v. Obama*, 561 F.3d 509, 515 n.7 (D.C. Cir. 2009). It follows that any travel restrictions imposed upon Gul and Hamad are traceable to the act of a foreign sovereign, and that any decision to lift those restrictions will depend upon an "exercise of broad and legitimate discretion [a] court[] cannot presume either to control or to predict." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). Gul and Hamad argue they seek to compel only the United States Government, and point out that we might order the Government to take all steps within its power to alleviate their injury. Reframing the remedy that way, however, does not alter the nature of the

---

[*] To the extent the appellants are arguing travel restrictions subject them to constructive "custody," *see* 28 U.S.C. § 2241(c) (a writ of habeas corpus shall not issue unless the petitioner "is in custody under or by color of the authority of the United States"), and, therefore, they continue to present justiciable cases without regard to the collateral consequences doctrine, we reject that argument because the Government's declarations make clear that Gul and Hamad are no longer in the custody of the United States. Decl. of Sandra L. Hodgkinson, Dep'y Asst. Sec'y of Defense for Detainee Affairs ¶ 5, July 9, 2008; Decl. of Lt. Col. David F. Koonce, Director, Detainee Capabilities Directorate for the Combined Security Transition Command-Afghanistan ¶¶ 3-8, Oct. 31, 2008. We also reject the appellants' argument terms in Gul's and Hamad's transfer agreements, which require the receiving Government to monitor the former detainees, somehow contradict the fact that once they are transferred the detainees are no longer in the custody of the United States.

injury claimed and therefore does not cure our lack of jurisdiction.

Gul and Hamad also argue they face travel restrictions of another sort, chargeable exclusively to the United States: As long as they are designated enemy combatants, they will be on the "No Fly List" and subject to a provision of the immigration code prohibiting any individual who has "engaged in terrorism" from entering the United States. Relying upon decisions permitting a deported alien to challenge his deportation after he has left U.S. custody, Gul and Hamad argue their inability to enter the United States likewise gives them a justiciable case or controversy.

As an initial matter, we point out there is no evidence in the record suggesting either Gul or Hamad actually wishes to enter the United States; the likelihood of either actually incurring the injury alleged is therefore exceedingly remote. In any event, the analogy upon which the appellants rely is flawed: The deported alien faces collateral consequences because domestic law either bars him permanently from the United States or requires him to wait some period of years before seeking re-entry, 8 U.S.C. § 1182(9)(A), and an order granting the deported alien a writ of habeas corpus and vacating his order of deportation would necessarily remove that barrier. *See, e.g.*, *Zegarra-Gomez v. INS*, 314 F.3d 1124, 1127 (9th Cir. 2003). An order granting a former detainee's habeas petition would not remove the statutory barriers to entry that exclude him.

First, "any individual who was a detainee held at ... Guantanamo Bay" must be included on the No Fly List. 49 U.S.C. § 44903(j)(2)(C)(v). Gul and Hamad will accordingly be barred from flights entering the United States regardless whether a court declares they were unlawfully detained. An

order granting a detainee's habeas petition would not mean his exoneration, nor would it be a determination he does not pose a threat to American interests; it would mean only that the Government has not proven the detainee more likely than not "materially support[ed]" or was a "part of" a force associated with al Qaeda or the Taliban. *See* Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) (reprinted at 50 U.S.C. § 1541 note); *Al-Bihani v. Obama*, 590 F.3d 866, 872–74 (D.C. Cir. 2010) (AUMF authorizes President to detain any individual who is a "part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners"). The Congress has provided by statute that apprehension by the military and transfer to Guantanamo is sufficient indicium of threat to require placing a former detainee upon the No Fly List. A decision on the merits of a former detainee's petition would not affect the barrier imposed by that law. *See Kiyemba v. Obama*, 605 F.3d 1046, 1048 (2010) ("it is within the exclusive power of the political branches to decide which aliens may, and which aliens may not, enter the Unites States, and on what terms" (internal quotation marks omitted)).[*]

---

[*] Gul and Hamad suggest in a skeletal footnote in their reply brief that for the Government to keep them on the No Fly List after they have been granted a writ of habeas corpus would violate their constitutional rights, "including due process, equal protection, and bill of attainder protections." To bolster their argument that being on the No Fly List is a collateral consequence, they note "assertion of those rights would have to first be predicated on a judicial determination that the designation and incarceration were unlawful." Even if a favorable habeas ruling might marginally improve the appellants' prospects in a hypothetical constitutional challenge to the statute as applied to them, those prospects are far too speculative to make their being listed a collateral consequence.

Nor can we redress any injury that might arise from the statute denying entry into the United States to anyone who "has engaged in a terrorist activity ... is a member of a terrorist organization ... [or] has received military-type training ... from or on behalf of [one]." 8 U.S.C. § 1182(a)(3)(B). Although the legality of detention might be relevant to the Executive's determination under § 1182(a)(3)(B), as the Government points out, that determination "involves a separate legal standard than the question of whether an individual was detainable"; "there are a number of factors in the immigration laws which [the Government] look[s] at in order to determine whether someone is excludable" and designation as an enemy combatant, unlike involvement with terrorism, "is not one of them." Therefore, the possibility the appellants will be denied entry into this country because of their prior detention or continuing designation, even if it were imminent, is too speculative to sustain the exercise of our jurisdiction. *See Lane*, 455 U.S. at 633 n.13 (where prior parole violation does not automatically make individual ineligible for future parole but is instead "simply one factor, among many, that may be considered by the parole authority," possibility parole will be denied after future conviction is insufficiently concrete to constitute injury meeting case-or-controversy requirement); *Spencer*, 523 U.S. at 16 (adverse "discretionary decision[s]" are not "collateral consequences" of parole violation).

Gul and Hamad also note that because they are designated enemy combatants they may be unable to enter or seek asylum in countries with laws similar to those of the United States. Surely, however, if a purported injury attributable to domestic immigration laws is too speculative to give the court jurisdiction, any claimed injury that might arise from the immigration laws of any other country must be as well.

### b. Laws of War

Gul and Hamad next argue that because they are designated enemy combatants, the United States does not consider them "civilians" and, therefore, under the laws of war, it may recapture, again detain, and even kill them. This claim of injury is the most speculative of all: The appellants apparently have no basis whatsoever for believing the Government might pursue them because of their continuing designation (or for that matter, any other reason). Indeed, the Government no longer attaches any legal significance to the term "enemy combatant." *See* Press Release, Dep't of Justice, Department of Justice Withdraws "Enemy Combatant" Definition for Guantanamo Detainees (Mar. 13, 2009); Respondent's Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In re Guantanamo Bay Detainee Litig.*, No. 08-442 (D.D.C. Mar. 13, 2009) (discussing scope of Executive authority to detain without reference to term "enemy combatant").

### c. Stigma

Gul and Hamad last claim that because they are designated enemy combatants they have suffered, and will continue to suffer, reputational harm. They argue stigmatization is alone consequence enough to establish their petitions are not moot, but our precedent forecloses their argument: "In this circuit, when injury to reputation is alleged as a secondary effect of an otherwise moot action, we [require] some tangible concrete effect ... susceptible to judicial correction" before we assert jurisdiction. *McBryde v. Comm. to Rev. Circuit Council Conduct*, 264 F.3d 52, 57 (2001) (internal quotation marks omitted); *see also Spencer*, 523 U.S. at 16 n.8 (dictum) (rejecting dissent's suggestion "a

finding that an individual has committed a serious felony renders the interest in vindicating reputation constitutionally [s]ufficient to avoid mootness" (internal quotation marks and alterations omitted)). As this case demonstrates, the label "enemy combatant" brings with it neither a "concrete effect" nor a "civil disability" susceptible to judicial correction. Hence, we cannot order the Government to rescind the appellants' designation.

## B.  Other Claimed Errors

Gul and Hamad also raise a number of procedural arguments pertaining to the district court's handling of their petitions. None has merit.

### 1.  Burden of Proof

Gul and Hamad first argue the district court erred by placing upon them the burden of showing their petitions present a live controversy rather than placing upon the Government the burden of showing the petitions are moot. In placing the burden to demonstrate collateral consequences upon the appellants, however, the district court recognized "it is the burden of the party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Spencer*, 523 U.S. at 11 (internal quotation marks omitted); *see In re Petitioners Seeking Habeas Corpus Relief*, 700 F. Supp. 2d at 129–30 & n.5. Although the appellants made the necessary showing when they filed their petitions — for they were then detained at Guantanamo and so alleged — once they left U.S. custody that showing no longer sufficed. As no continuing injury is to be presumed, *see* Part II.A.1, the burden of demonstrating jurisdiction is properly borne by the appellants. *See Zalawadia v. Ashcroft,* 371 F.3d 292, 297 (5th

Cir. 2004) (Supreme Court in *Spencer* explained: "for a court to exercise habeas jurisdiction over a petitioner no longer in custody, the petitioner must demonstrate ... his subsequent release has not rendered the petition moot"). The district court did not err by so holding.

### 2. Individualized Consideration

Gul and Hamad next argue the district court, by requiring all former detainees to join in one consolidated brief, failed to consider the individual facts of each detainee's case. What the district court did to deal with the petitions of more than 100 detainees on the same basic issue is of no moment any more. Gul and Hamad have been fully heard in this court and have raised no individual issue sufficient to establish their cases are not moot.

### 3. Equitable Concerns

Gul and Hamad last argue that in view of the mandate requiring the court to dispose of a petition for a writ of habeas as "law and justice require," 28 U.S.C. § 2243, the district court erred by failing adequately to consider equitable factors bearing upon whether their petitions should be dismissed as moot. In particular, they argue (1) if they are permitted to proceed, then they will establish their prior detention was unlawful whereas (2) if they may not proceed, then the Government will be unjustly benefitted for having caused the district court not to reach the merits of their petitions before their release by, for example, refusing to proceed with discovery while the jurisdictional issues surrounding the enactment of the DTA and the MCA were resolved.

The appellants indeed were denied a forum in which to bring their habeas petitions for a prolonged period before the

Supreme Court assured them of one in *Boumediene*. Regardless of the equity that delay might afford the appellants, "mootness, however it may have come about, simply deprives us of our power to act." *Spencer*, 523 U.S. at 18 (rejecting habeas petitioner's argument that "even if his case is moot, that fact should be ignored because it was caused by the dilatory tactics of [government officials] and the delay of the District Court"). Equity is not a substitute for meeting the requirements of Article III.

## III. Conclusion

Gul and Hamad have not identified any collateral consequence sufficient to show their petitions for a writ of habeas corpus are not moot. Therefore, the judgment of the district court is

**Affirmed.**