Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Chief Judge SENTELLE joins except as to footnote 6, and with whom Senior Judge GINSBURG joins except as to footnotes 3, 6, and 8.
Concurring Opinion filed by Senior Circuit Judge GINSBURG.
KAVANAUGH, Circuit Judge:
The United States is at war against al Qaeda, an international terrorist organization. Al Qaeda’s stated goals are, among other things, to drive the United States from posts in the Middle East, to devastate the State of Israel, and to help establish radical Islamic control over the Greater Middle East. Al Qaeda uses terror to advance its broad objectives. Al Qaeda terrorists do not wear uniforms, and they target American civilians and members of the U.S. Military, as well as U.S. allies. After al Qaeda’s attacks on the United States on September 11, 2001, Congress authorized the President to wage war against al Qaeda. That war continues.
In war, when the United States captures or takes custody of alien enemy combatants or their substantial supporters, it may detain them for the duration of hostilities. Moreover, the United States may try unlawful alien enemy combatants before military commissions for their war crimes. See Hamdi v. Rumsfeld, 542 U.S. 507, 518-24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004); Ex parte Quirin, 317 U.S. 1, 26-45, 63 S.Ct. 2, 87 L.Ed. 3 (1942).
This case raises questions about the scope of the Executive’s authority to prosecute war crimes under current federal statutes.
This particular dispute involves the military commission conviction of Salim Hamdan, an al Qaeda member who worked for Osama bin Laden. In 2001, Hamdan was captured in Afghanistan. He was later transferred to the U.S. Naval Base at Guantanamo Bay, Cuba.
Hamdan was not just detained at Guantanamo as an enemy combatant. He was also accused of being an unlawful enemy combatant and was tried and convicted by a military commission for “material support for terrorism,” a war crime specified by the Military Commissions Act of 2006. See 10 U.S.C. § 950t(25); see also 10 U.S.C. § 950v(b)(25) (2006) (previous codification of same provision). Hamdan’s conviction was based on actions he took from 1996 to 2001 — before enactment of the Military Commissions Act. At the time of Hamdan’s conduct, the extant federal statute authorized and limited military commissions to try violations of the “law of war.” 10 U.S.C. § 821.
As punishment for his war crime, Hamdan was sentenced by the military commission to 66 months’ imprisonment, with *1241 credit for some time already served. Hamdan’s sentence expired in 2008. Although the United States may have continued to detain Hamdan until the end of hostilities pursuant to its wartime detention authority, see Hamdi, 542 U.S. at 518— 22, 124 S.Ct. 2633, Hamdan was transferred in late 2008 to Yemen and then released there. Even after his release, Hamdan has continued to appeal his U.S. war crimes conviction.
This appeal presents several issues. First, is the dispute moot because Hamdan has already served his sentence and been released from U.S. custody? Second, does the Executive have authority to prosecute Hamdan for material support for terrorism on the sole basis of the 2006 Military Commissions Act — which specifically lists material support for terrorism as a war crime triable by military commission — even though Hamdan’s conduct occurred from 1996 to 2001, before enactment of that Act? Third, if not, did the pre-existing statute that authorized war-crimes military commissions at the time of Hamdan’s conduct — a statute providing that military commissions may try violations of the “law of war,” 10 U.S.C. § 821 — proscribe material support for terrorism as a war crime? We conclude as follows:
First, despite Hamdan’s release from custody, this case is not moot. This is a direct appeal of a conviction. The Supreme Court has long held that a defendant’s direct appeal of a conviction is not mooted by the defendant’s release from custody.
Second, consistent with Congress’s stated intent and so as to avoid a serious Ex Post Facto Clause issue, we interpret the Military Commissions Act of 2006 not to authorize retroactive prosecution of crimes that were not prohibited as war crimes triable by military commission under U.S. law at the time the conduct occurred. Therefore, Hamdan’s conviction may be affirmed only if the relevant statute that was on the books at the time of his conduct — 10 U.S.C. § 821 — encompassed material support for terrorism.
Third, when Hamdan committed the relevant conduct from 1996 to 2001, Section 821 of Title 10 provided that military commissions may try violations of the “law of war.” The “law of war” cross-referenced in that statute is the international law of war. See Quirin, 317 U.S. at 27-30, 35-36, 63 S.Ct. 2. When Hamdan committed the conduct in question, the international law of war proscribed a variety of war crimes, including forms of terrorism. At that time, however, the international law of war did not proscribe material support for terrorism as a war crime. Indeed, the Executive Branch acknowledges that the international law of war did not — and still does not — identify material support for terrorism as a war crime. Therefore, the relevant statute at the time of Hamdan’s conduct — 10 U.S.C. § 821 — did not proscribe material support for terrorism as a war crime.
Because we read the Military Commissions Act not to retroactively punish new crimes, and because material support for terrorism was not a pre-existing war crime under 10 U.S.C. § 821, Hamdan’s conviction for material support for terrorism cannot stand. We reverse the judgment of the Court of Military Commission Review and direct that Hamdan’s conviction for material support for terrorism be vacated.[1]
*1242 I
In 1996, Salim Hamdan traveled from his native Yemen to Pakistan and then to Afghanistan to participate in jihad. In Afghanistan, Hamdan attended an al Qaeda training camp. At the camp, Hamdan received weapons training, met Osama bin Laden, and listened to bin Laden’s lectures.
Later in 1996, Hamdan became an al Qaeda driver. His duties included transporting personnel, supplies, and weapons between an al Qaeda guesthouse and al Qaeda’s al Farouq training camp in Afghanistan. Eventually, Hamdan became Osama bin Laden’s personal driver and bodyguard.
In August 1996, Osama bin Laden publicly declared war on the United States. That declaration came after various al Qaeda terrorist attacks, including the 1993 bombing of the World Trade Center. In 1998, bin Laden issued a fatwa calling for the indiscriminate killing of Americans, including American civilians. Hamdan was fully aware of bin Laden’s public statements targeting the United States.
In August 1998, al Qaeda operatives bombed U.S. Embassies in Kenya and Tanzania, killing 257 people, including 12 Americans. Hamdan was generally aware that such an attack was planned. Around the time of the attack, Hamdan assisted Osama bin Laden in evacuating from Kandahar and moving around Afghanistan.
Later in August 1998, asserting the President’s Article II power of self-defense, President Clinton ordered the U.S. Military to bomb targets in Afghanistan in an attempt to kill bin Laden. Bin Laden narrowly avoided being killed in that military action.
In October 2000, at the direction of bin Laden and senior al Qaeda leaders, al Qaeda bombed the U.S.S. Cole off the coast of Yemen, killing 17 Americans and injuring many others. Around that time, Hamdan returned to Afghanistan from Yemen.
In August 2001, Hamdan drove bin Laden to various planning meetings in Afghanistan. Several days before September 11, 2001, bin Laden told Hamdan that they had to evacuate their compound because of an impending operation. Hamdan drove bin Laden to Kabul. They later moved to a series of locations around Afghanistan.
On September 11, 2001, al Qaeda attacked the United States, killing thousands of civilians and causing massive long-term damage to the American economy and way of life.
In the days following the attacks of September 11, 2001, Congress passed and President George W. Bush signed the Authorization for Use of Military Force. That law authorized the President
to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
Pub. L. No. 107-40, 115 Stat. 224 (2001).
Consistent with the 2001 Authorization for Use of Military Force, President Bush directed the use of force to kill or capture and detain al Qaeda operatives, and where *1243 appropriate to try unlawful al Qaeda combatants who had committed war crimes. On October 7, 2001, as part of the overall operation, President Bush ordered U.S. troops into Afghanistan to wage war against al Qaeda there, as well as against the Taliban government that was in control of Afghanistan and had been supporting and harboring al Qaeda.
On November 13, 2001, the President issued an executive order establishing military commissions to try al Qaeda members and aiders and abettors who had committed war crimes as defined under the “laws of war” or other “applicable laws.” Military Order of Nov. 13, 2001, 66 Fed. Reg. 57,833; 57,833-34. The executive order did not purport to rely solely on the President’s constitutional authority; rather, it cited two separate statutes as congressional authorization for the President to employ military commissions: the 2001 Authorization for Use of Military Force and 10 U.S.C. § 821, the long-standing statute that authorized military commissions to try violations of the “law of war.”
In November 2001, Hamdan was captured in Afghanistan while driving toward Kandahar. The car he was driving contained two anti-aircraft missiles. Also in the car was an al Qaeda-issued document that authorized the bearer to carry a weapon in Afghanistan. Hamdan’s captors turned him over to U.S. authorities. He was later transferred to Guantanamo Bay, Cuba, and the U.S. Military detained him there as an enemy combatant.
At Guantanamo, Hamdan not only was detained as an enemy combatant but also was eventually charged with one count of conspiracy and was to be tried before a military commission as an unlawful enemy combatant who had committed war crimes.[2] Hamdan raised various legal objections to the prosecution, and the case ultimately wound its way to the Supreme Court. The Supreme Court held that the military commission rules then in place contravened statutory limits because the rules did not comply in certain respects with statutory restrictions contained in 10 U.S.C. § 836. See Hamdan v. Rumsfeld, 548 U.S. 557, 613-35, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court split 4-3 on and thus did not decide a separate issue: whether conspiracy was a cognizable charge in a military commission under the “law of war” for purposes of 10 U.S.C. § 821. Compare Hamdan, 548 U.S. at 595-612, 126 S.Ct. 2749 (Stevens, J., plurality opinion) (conspiracy is not a law of war crime), with id. at 697-706, 126 S.Ct. 2749 (Thomas, J., dissenting) (conspiracy is a law of war crime). (Justice Kennedy did not address that issue; Chief Justice Roberts did not participate in the case.)
In the Hamdan case, several Justices specifically invited Congress to clarify the scope of the President’s statutory authority to use military commissions to try unlawful alien enemy combatants for war crimes. See Hamdan, 548 U.S. at 636, 126 S.Ct. 2749 (Breyer, J., concurring); id. at 636-37, 126 S.Ct. 2749 (Kennedy, J., concurring).
In the wake of the Supreme Court’s decision in Hamdan, Congress enacted a new military commissions statute. See Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond prosecuting vio *1244 lations of the generic “law of war,” spying, and aiding the enemy, which were the crimes listed by statute at the time. See 10 U.S.C. §§ 821, 904, 906. Of most importance here, Congress alleviated some of the uncertainty highlighted in Hamdan about the phrase “law of war” in 10 U.S.C. § 821 by listing a large number of specific war crimes that could be charged by military commission, including conspiracy and material support for terrorism. See § 3(a), 120 Stat. at 2630. (In 2009, Congress enacted a new Military Commissions Act; that law did not make changes relevant to this case. See Pub. L. No. 111-84, 123 Stat. 2574.)
After passage of the 2006 Military Commissions Act, Hamdan was charged anew before a U.S. military commission on one charge of conspiracy and one charge, containing eight specifications, of material support for terrorism.
At his military commission trial, Hamdan was acquitted of conspiracy but convicted of five specifications of material support for terrorism. In August 2008, he was sentenced to 66 months’ confinement and credited for having already served most of that time.
When his sentence ended later in 2008, the war against al Qaeda had not ended. Therefore, the United States may have continued to detain Hamdan as an enemy combatant. See Hamdan, 548 U.S. at 635, 126 S.Ct. 2749; Hamdi v. Rumsfeld, 542 U.S. 507, 518-24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). But in November 2008, Hamdan was transferred by the U.S. Military to Yemen, and he was then released on or about January 8, 2009, in Yemen.
After his release, Hamdan nonetheless continued to appeal his U.S. military commission conviction. On appeal to the en banc Court of Military Commission Review, Hamdan argued (i) that Congress lacked authority under Article I of the Constitution to make material support for terrorism a war crime triable by military commission; (ii) that in any event, the 2006 Military Commissions Act, which listed material support for terrorism as a war crime, could not be retroactively applied to him because his conduct occurred from 1996 to 2001; and (iii) that the statute in effect at the time of his alleged conduct— 10 U.S.C. § 821, which limited military commissions to violations of the “law of war” — did not authorize prosecution of material support for terrorism as a war crime. In 2011, the Court of Military Commission Review affirmed the conviction. See United States v. Hamdan, 801 F.Supp.2d 1247 (C.M.C.R.2011) (en banc).
By statute, Hamdan has an automatic right of appeal to this Court. See 10 U.S.C. § 950g.
II
 We must first address the issue of mootness — that is, whether this appeal is moot because Hamdan has been released from U.S. custody. Although the parties agree that the appeal is not moot, mootness is a jurisdictional question that we must independently consider. See United States v. Juvenile Male, — U.S. -, 131 S.Ct. 2860, 2864-65, 180 L.Ed.2d 811 (2011); Sibron v. New York, 392 U.S. 40, 50 n. 8, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
This case is a direct appeal of a military commission conviction. In the criminal context, a direct appeal of a criminal conviction is not mooted by a defendant’s release from custody. See Sibron, 392 U.S. 40, 88 S.Ct. 1889. The Supreme Court has so ruled in part because of the collateral legal consequences of a conviction — namely, the possibility that the defendant could commit or be tried for a new *1245 offense, the punishment for which could take account of a past conviction. Those collateral consequences are of course present in virtually all criminal cases (other than, for example, when the defendant has died after the conviction and thus obviously cannot commit a new offense). The same collateral consequences are present in military commission conviction cases. See, e.g., Manual for Military Commissions, Rules 1001(a)(2), 1001(b)(1)(A) (2012) (in military commission sentencing, the prosecution may “introduce evidence of military or civilian convictions, foreign or domestic, of the accused” as an aggravating factor); 18 U.S.C. § 3553(a)(1) (sentencing courts shall take into account “the history and characteristics of the defendant”).[3] Applying the relevant Supreme Court precedent, we therefore conclude that a direct appeal of a military commission conviction is likewise not mooted by the defendant’s release.
To be sure, that principle generally does not apply to the habeas context where a detainee is challenging the basis for executive detention. Such a habeas case is sometimes moot after the detainee’s release. See Spencer v. Kemna, 523 U.S. 1, 8-14, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); Gul v. Obama, 652 F.3d 12, 17 (D.C.Cir.2011). In our recent habeas decision in Gul, where a former Guantanamo detainee objected to a military detention determination after his release, this Court dismissed the case as moot.
But Hamdan is not just a military detainee; he has been convicted of a war crime by military commission. Therefore, our recent decision in Gul does not control here. Rather, this case is controlled by the principle that a direct appeal of a conviction is not mooted by the defendant’s release from custody.
This case is not moot.
Ill
Under a law now codified at 10 U.S.C. § 821, Congress has long authorized the Executive to use military commissions to try war crimes committed by the enemy. See Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). That statute authorizes military commissions to try violations of the “law of war” — a term, as we explain below, that has long been understood to mean the international law of war. See Hamdan v. Rumsfeld, 548 U.S. 557, 603, 610, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality); id. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring); Quirin, 317 U.S. at 27-30, 35-36, 63 S.Ct. 2. Two other longstanding statutes separately authorize military commission prosecutions for spying and aiding the enemy. See 10 U.S.C. §§ 904, 906.[4]
*1246 After the Supreme Court’s 2006 decision in Hamdan, Congress enacted a new military commissions statute that, among other things, clarified the scope of the Executive’s authority to try war crimes. See Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond trying violations of the generic “law of war,” spying, and aiding the enemy. Congress instead also listed a large number of specific war crimes that could be tried by military commission, including conspiracy and material support for terrorism. See id. § 3(a), 120 Stat. at 2630 (now codified at 10 U.S.C. § 950t).
Hamdan argues that Congress lacked authority under Article I of the Constitution — namely, the Define and Punish Clause — to define material support for terrorism as a war crime subject to trial by a U.S. military commission.[5] Hamdan maintains that Congress’s authority under the Define and Punish Clause is limited to proscribing offenses that are already illegal under international law. And Hamdan contends that material support for terrorism is not a recognized international-law war crime. The Government responds that Hamdan’s focus on the Define and Punish Clause alone is misplaced. According to the Government, the Declare War Clause and other war clauses in Article I, as supplemented by the Necessary and Proper Clause, independently authorize Congress to establish military commissions to try an enemy’s war crimes. And the Government further contends that Congress’s broad authority under the Declare War Clause is not constrained by the evolving and often difficult to discern standards of international law. Therefore, as the Government sees it, Congress has authority to make material support for terrorism a war crime triable by military commission.
We do not decide that antecedent question. Even assuming arguendo that Congress had authority under its various Article I war powers to establish material support for terrorism as a war crime in the Military Commissions Act of 2006,[6] we *1247 conclude that the Act did not authorize retroactive prosecution for conduct that was committed before the Act’s enactment and was not prohibited by U.S. law at the time the conduct occurred. Here, Hamdan’s conduct occurred from 1996 to 2001 — before enactment of the Military Commissions Act. And as we will explain, the federal statute in effect at the time of Hamdan’s conduct — -10 U.S.C. § 821 — did not authorize prosecution for material support for terrorism.
A
As is clear from the text of the Military Commissions Act of 2006, Congress was quite concerned about the ex post facto implications of retroactively prosecuting someone under the Act for conduct committed before its enactment. Congress tried to deal with any ex post facto problem by declaring in the text of the statute that “[t]he provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.” § 3(a), 120 Stat. at 2624. The Act continued: “Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.” Id.
As Congress well understood when it appended this unusual statement to the statute, the U.S. Constitution bars Congress from enacting punitive ex post facto laws. See U.S. Const, art. I, § 9, cl. 3 (“No Bill of Attainder or ex post facto Law shall be passed.”). Among other things, the Ex Post Facto Clause bars laws that retroactively punish conduct that was not previously prohibited, or that retroactively increase punishment for already prohibited conduct. See Collins v. Youngblood, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.). The Ex Post Facto Clause thus prevents Congress and the Executive from retroactively applying a federal criminal statute to conduct committed before the statute was enacted.
As Congress itself recognized in the statutory text, retroactive prosecution by military commission could similarly raise serious constitutional issues, at the very least. As stated in the statutory text, however, Congress believed that the Act codified no new crimes and thus posed no ex post facto problem. As we explain below, Congress’s premise was incorrect. The statute does codify some new war crimes, including material support for terrorism. The question for ex post facto purposes is this: If Congress had known that the Act was codifying some new crimes, would Congress have wanted the new crimes to be enforced retroactively? To begin with, the statutory text reveals a tight causal link between (i) Congress’s *1248 belief that the statute codified only crimes under pre-existing law and (ii) Congress’s statement that the statute could therefore apply to conduct before enactment. That causal link suggests that Congress would not have wanted new crimes to be applied retroactively. The Executive Branch agrees with that interpretation of the statute, stating: “Congress incorporated ex post facto principles into the terms of the MCA itself.” Brief for the United States at 66. At a minimum, we know that the statutory text does not contemplate or address the possibility of retroactively applying new crimes, leaving us with at least something of an ambiguity. And courts interpret ambiguous statutes to avoid serious questions of unconstitutionality. See Rapanos v. United States, 547 U.S. 715, 738, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (plurality opinion of Scalia, J.) (constitutional avoidance where statute “raises difficult questions” of constitutionality); Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631, 646, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) (avoiding an interpretation that “may violate the Constitution”). To avoid the prospect of an Ex Post Facto Clause violation here, we interpret the Military Commissions Act of 2006 so that it does not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission. In this case, therefore, Hamdan’s conviction stands or falls on whether his conduct was prohibited by the pre-existing statute, 10 U.S.C. § 821, at the time he committed the conduct.[7]
B
Before enactment of the Military Commissions Act in 2006, U.S. military commissions could prosecute war crimes under 10 U.S.C. § 821 for violations of the “law of war.” The Government suggests that at the time of Hamdan’s conduct from 1996 to 2001, material support for terrorism violated the “law of war” referenced in 10 U.S.C. § 821. It is true that in the text of the Military Commissions Act of 2006, Congress declared its belief that material support for terrorism was a pre-existing crime under the law of war and thus under 10 U.S.C. § 821. See § 3a, 120 Stat. at 2624. But exercising our independent review, as we must when considering the ex post facto implications of a new law, see Calder v. Bull, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.); Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803), we conclude otherwise. Material support for terrorism was not a war crime under the law of war referenced in 10 U.S.C.. § 821 at the time of Hamdan’s conduct.
Analysis of this issue begins by determining what body of law is encompassed by the term “law of war” in 10 U.S.C. § 821. The Supreme Court’s precedents tell us: The “law of war” referenced in 10 U.S.C. § 821 is the international law of war.[8] See Hamdan, 548 U.S. at 603, 126 S.Ct. 2749 (plurality) (act is law *1249 of war offense when “universal agreement and practice both in this country and internationally” recognize it as such) (internal quotation marks omitted); id. at 610, 126 S.Ct. 2749 (analyzing international sources to determine whether conspiracy was “recognized violation of the law of war”); id. at 641, 126 S.Ct. 2749 (Kennedy, J., concurring) (“the law of war” referenced in 10 U.S.C. § 821 “derives from rules and precepts of the law of nations” and is “the body of international law governing armed conflict”) (internal quotation marks omitted); Quinn, 317 U.S. at 29, 63 S.Ct. 2 (“law of war” referenced in 10 U.S.C. § 821 is a “branch of international law”); id. at 27-28, 63 S.Ct. 2 (The “law of war” is “that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals.”); see also Instructions for the Government of Armies of the United States in the Field (Lieber Code), General Orders No. 100, arts. 27 & 40 (Apr. 24, 1863) (describing the law of war as a “branch” of the “law of nations”); O.L.C. Memorandum from Patrick F. Phil-bin to Alberto R. Gonzales 5 (Nov. 6, 2001) (“laws of war” are “considered a part of the ‘Law of Nations’ ”); id. at 29, 63 S.Ct. 2 (“the term ‘law of war’ used in 10 U.S.C. § 821 refers to the same body of international law now usually referred to as the ‘laws of armed conflict’ ”).[9]
We turn, then, to the question whether material support for terrorism is an international-law war crime.
It is true that international law establishes at least some forms of terror *1250 ism, including the intentional targeting of civilian populations, as war crimes. See, e.g., Rome Statute of the International Criminal Court art. 8(2)(b), July 17, 1998, 2187 U.N.T.S. 90; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), art. 33, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Commission of Responsibilities, Conference of Paris 1919, Violation of the Laws and Customs of War 17 (Clarendon Press 1919) (the Allied Nations condemned Germany for “the execution of a system of terrorism” after World War I).
But the issue here is whether material support for terrorism is an international-law war crime. The answer is no. International law leaves it to individual nations to proscribe material support for terrorism under their domestic laws if they so choose. There is no international-law proscription of material support for terrorism.
To begin with, there are no relevant international treaties that make material support for terrorism a recognized international-law war crime. Neither the Hague Convention nor the Geneva Conventions— the sources that are “the major treaties on the law of war” — acknowledge material support for terrorism as a war crime. See Hamdan, 548 U.S. at 604, 126 S.Ct. 2749 (plurality); Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Hague Convention (IV) Respecting the Laws and Customs of War on Land and Its Annex, Oct. 18,1907, 36 Stat. 2277.
Nor does customary international law otherwise make material support for terrorism a war crime. Customary international law is a kind of common law; it is the body of international legal principles said to reflect the consistent and settled practice of nations. See Restatement (Third) of Foreign Relations Law of the United States § 102(2) (1987) (“Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation”). It is often difficult to determine what constitutes customary international law, who defines customary international law, and how firmly established a norm has to be to qualify as a customary international law norm. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).[10]
*1251 But here, the content of customary international law is quite evident. Material support for terrorism was not a recognized violation of the international law of war as of 2001 (or even today, for that matter). As we have noted, the Geneva Conventions and the Hague Convention do not prohibit material support for terrorism. The 1998 Rome Statute of the International Criminal Court, which catalogues an extensive list of international war crimes, makes no mention of material support for terrorism. See Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Nor does the Statute of the International Tribunal for the Former Yugoslavia, the Statute of the International Tribunal for Rwanda, or the Statute of the Special Court for Sierra Leone. See Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), reprinted in 32 I.L.M. 1159, 1192; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), reprinted in 33 I.L.M. 1598, 1602 (includes terrorism itself as a crime); Statute of the Special Court for Sierra Leone art. 3(d), Jan. 16, 2002, 2178 U.N.T.S. 138 (same). Nor have any international tribunals exercising common-law-type power determined that material support for terrorism is an international-law war crime.
Commentators on international law have similarly explained that material support for terrorism is not an international-law war crime. See, e.g., Andrea Bianchi & Yasmin Naqvi, International Humanitarian Law and Terrorism 244 (2011) (“there is little evidence” that a proscription of “material support for terrorism” is “considered to be part of the laws and customs of war”). Nor is the offense of material support for terrorism listed in the JAG handbook on the law of war. See U.S. Army Jag, Law of War Handbook (Maj. Keith E. Puls ed., 2005); see also Jennifer K. Elsea, The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice 12 (CRS, updated Sept. 27, 2007) (“defining as a war crime the ‘material support for terrorism’ does not appear to be supported by historical precedent”) (footnote omitted).
In short, neither the major conventions on the law of war nor prominent modern international tribunals nor leading international-law experts have identified material support for terrorism as a war crime. Perhaps most telling, before this case, no person has ever been tried by an international-law war crimes tribunal for material support for terrorism.
Not surprisingly, therefore, even the U.S. Government concedes in this case that material support for terrorism is not a recognized international-law war crime. No treaty that the Government has cited or that we are aware of identifies material support for terrorism as a war crime. And the Government further admits: The “offense of providing material support to terrorism, like spying and aiding the enemy, has not attained international recognition at this time as a violation of customary international law.” Brief for the United States at 48; see also id. at 55-56 (same).
To be sure, there is a strong argument that aiding and abetting a recognized international-law war crime such as terrorism is itself an international-law war crime. And there are other similar war crimes. *1252 But Hamdan was not charged with aiding and abetting terrorism or some other similar war crime. He was charged with material support for terrorism. And as the Government acknowledges, aiding and abetting terrorism prohibits different conduct, imposes different mens rea requirements, and entails different causation standards than material support for terrorism. If the Government wanted to charge Hamdan with aiding and abetting terrorism or some other war crime that was sufficiently rooted in the international law of war (and thus covered by 10 U.S.C. § 821) at the time of Hamdan’s conduct, it should have done so.
The Government latches on to a few isolated precedents from the Civil War era to prop up its assertion that material support for terrorism was a preexisting war crime as of 2001 for purposes of 10 U.S.C. § 821. There are several independent reasons that those cases fail to support the Government’s argument. First, the Civil War cases did not involve any charges of material support for terrorism. Instead, several cases involve guerillas who were punished for taking up “arms” as “insurgents” — that is, for direct attacks rather than material support. See, e.g., G.O. No. 15, HQ, Dep’t of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 472-76. Others were convicted of “joining, aiding and assisting a band of robbers and bandits” — in other words, what we would likely call aiding and abetting, not material support. G.O. No. 19, HQ, Dep’t of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 478. In short, those precedents are at best murky guidance here. Cf. Hamdan, 548 U.S. at 602, 126 S.Ct. 2749 (plurality) (requiring “plain and unambiguous” precedent). Second, those Civil War commissions were in part military tribunals governing certain territory — which are a separate form of military commission subject to a separate branch of law, and not the kind of law-of-war military commission at issue here. As others have suggested, their precedential value is therefore limited. See Hamdan, 548 U.S. at 596 n. 27, 126 S.Ct. 2749; id. at 608, 126 S.Ct. 2749 (plurality) (The “military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. Accordingly, they regularly tried war crimes and ordinary crimes together.”) (citation omitted). Third, and perhaps most to the point, those cases do not establish that material support for terrorism was a war crime recognized under international law as of 1996 to 2001 when Hamdan committed his conduct, which is the relevant inquiry under 10 U.S.C. § 821. The Government contends that those Civil War precedents illuminate what it calls the “U.S. common law of war” — not the international law of war. But the statutory constraint here imposed by 10 U.S.C. § 821 is the international law of war. As the Government told the Supreme Court in Quirin, “This ‘common law of war’ is a centuries-old body of largely unwritten rules and principles of international law which governs the behavior of both soldiers and civilians during time of war.” Brief for the United States at 29, in Quirin, 317 U.S. 1, 63 S.Ct. 2 (emphasis added) (citation omitted). To be sure, U.S. precedents may inform the content of international law. But those Civil War precedents fail to establish material support for terrorism as a war crime under the international law of war as of 1996 to 2001. And even the Government admits that material support for terrorism was not an international-law war crime as of 1996 to 2001.
In short, material support for terrorism was not an international-law war crime *1253 under 10 U.S.C. § 821 at the time Hamdan engaged in the relevant conduct.
Because we read the Military Commissions Act not to sanction retroactive punishment for new crimes, and because material support for terrorism was not a preexisting war crime under 10 U.S.C. § 821, Hamdan’s conviction for material support for terrorism cannot stand. We reverse the decision of the Court of Military Commission Review and direct that Hamdan’s conviction for material support for terrorism be vacated.

So ordered.

. Our judgment would not preclude detention of Hamdan until the end of U.S. hostilities against al Qaeda. Nor does our judgment preclude any future military commission charges against Hamdan — either for conduct prohibited by the "law of war” under 10 U.S.C. § 821 or for any conduct since 2006 that has violated the Military Commissions *1242 Act. Nor does our judgment preclude appropriate criminal charges in civilian court. Moreover, our decision concerns only the commission’s legal authority. We do not have occasion to question that, as a matter of fact, Hamdan engaged in the conduct for which he was convicted.

. Generally speaking, enemy soldiers or combatants are considered unlawful enemy combatants when they, for example, join or support an organization waging unlawful war or they commit specific “acts which render their belligerency unlawful.” Ex parte Quirin, 317 U.S. 1, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942). For purposes of the war against al Qaeda, this concept is now defined by statute. See 10 U.S.C. § 948a.

. In his concurring opinion, Judge Ginsburg calls for a change to existing Supreme Court mootness doctrine. In doing so, Judge Ginsburg suggests that Hamdan is in Yemen and has little chance of landing in future trouble in the U.S. legal system. Maybe. Maybe not.

. The “aiding the enemy" proscription in 10 U.S.C. § 904, which was first codified in the Articles of War of 1806, see William Winthrop, Military Law and Precedents 102-03, 981 (rev. 2d ed. 1920), generally requires breach of a duty of loyalty as well as aid to the enemy. See Hamdan, 548 U.S. at 600-01 n. 32, 126 S.Ct. 2749 (plurality) ("aiding the enemy may, in circumstances where the accused owes allegiance to the party whose enemy he is alleged to have aided, be triable by militaiy commission”). The breach of loyalty requirement is made explicit in the 2006 Military Commissions Act, which re-codified the crime. 10 U.S.C. § 950t(26) (“Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.”) (emphasis added).

. The Define and Punish Clause provides that Congress has the power: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations.” U.S. Const, art. I, § 8, cl. 10.

. Judge Kavanaugh alone concurs in this footnote. Because the question of Congress’s Article I power to make material support for terrorism a war crime has been thoroughly briefed and argued, because that question is logically antecedent to the ex post facto issue, and because of the importance of deciding wartime cases in a way that provides clear guidance, Judge Kavanaugh believes it appropriate to address the antecedent question — as the Supreme Court itself did in resolving similar antecedent issues in both Hamdi and Hamdan. See Hamdi, 542 U.S. at 516-24, 533-34, 124 S.Ct. 2633 (resolving several "threshold” questions, including whether enemy combatants may be detained for the duration of hostilities, before concluding that the procedures used to detain Hamdi were insufficient); Hamdan, 548 U.S. at 593-94, 126 S.Ct. 2749 (resolving antecedent question whether relevant statutes generally authorized military commissions, before concluding that the commission in Hamdan's case contravened separate statutory limits). Here, Judge Kavanaugh would conclude that Congress has authority under Article I, § 8 to establish material support for terrorism as a war crime that, when committed by an alien, may be tried by military commission. Although material support for terrorism is not yet an international-law war crime, Congress’s war powers under Article I are not defined or constrained by international law. The Declare War Clause and the other Article I war powers clauses do not refer to international law, unlike the Define and Punish Clause. Moreover, Congress has long prohibited war crimes beyond those specified by international law. See 10 U.S.C. § 904 (aiding the enemy); id. § 906 (spying); cf. Quinn, 317 U.S. 1, 63 S.Ct. 2. The U.S. Constitution *1247 does not give the international community— either directly, or indirectly through the vehicle of international law — a judicially enforceable veto over Congress's exercise of its war powers. Put simply, the United States may be a leader in the international community, not just a follower, when Congress authorizes war against a terrorist organization or makes crimes such as material support for terrorism war crimes triable by military commission. To be sure, it is often prudent for Congress and the President to coordinate closely with the international community and pay careful attention to international law when authorizing war and enacting war crimes. But those policy factors, political realities, and international-law considerations are not constitutional constraints incorporated into the Article I war powers clauses and thereby enforceable in U.S. courts.

. To be clear, we do not here decide whether or how the Ex Post Facto Clause might apply to this case. As we interpret the statute, that ultimate constitutional question need not be decided.

. It has been suggested that courts should not use international law as a free-floating tool to alter how the courts would otherwise interpret a domestic U.S. statute when the statute does not incorporate or refer to international law. See Al-Bihani v. Obama, 619 F.3d 1, 5-8 (D.C.Cir.2010) (Brown, J., concurring in denial of rehearing en banc); id. at 9-23 (Kavanaugh, J., concurring in denial of rehearing en banc). Bui that interpretive issue is not implicated in this case. As Congress has often done, and as explained in an AlBihani concurrence, Congress here explicitly referred to international law and explicitly incorporated international norms into domes *1249 tic U.S. law in 10 U.S.C. § 821 by means of the express cross-reference to the "law of war.” See id. at 10, 13-15 (Kavanaugh, J., concurring in denial of rehearing en banc) (explaining that distinction).

. See also Curtis A. Bradley & Jack L. Goldsmith, The Constitutional Validity of Military Commissions, 5 Green Bag 2d 249, 256 (2002) ("As noted above, President Bush’s Military Order, 10 U.S.C. § 821, and Supreme Court precedent all indicate that the jurisdiction of military commissions extends (at least) to violations of the international laws of war.”); Maj. Michael A. Newton, Continuum Crimes: Military Jurisdiction Over Foreign Nationals Who Commit International Crimes, 153 Mil. L. Rev. 1, 21 (1996) ("Therefore, the entire scope of history and American jurisprudence compel the conclusion that Article 21 grants jurisdiction only over violations of the international laws of war. The text of Article 21 leads to the same conclusion.”); Ruth Wedgwood, Al Qaeda, Terrorism, and Military Commissions, 96 Am. J. Int’l L. 328, 334 (2002) ("This statutory language" in 10 U.S.C. § 821 "acknowledges that the jurisdiction of military commissions is defined by the norms of the customary law of nations, namely, the law of war.”).
Even outside the context of 10 U.S.C. § 821, the term “law of war” in the U.S. Code and precedent generally refers to the international law of war. See Madsen v. Kinsella, 343 U.S. 341, 354, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (The "law of war” includes that part of "the law of nations” which "defines the powers and duties of belligerent powers.”); Prize Cases, 67 U.S. 635, 667, 2 Black 635, 17 L.Ed. 459 (1863) ("The laws of war, as established among nations, have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war.”); Hearings on H.R. 2498 (UCMJ) Before the H. Comm, on Armed Servs., 81st Cong. 959 (1949) (Representative Overton Brooks, Chairman, House Subcommittee No. 1 on Armed Services: “What is a law of war?” Colonel John P. Dinsmore: " 'Law of war’ is set out in various treaties like the Geneva convention and supplements to that.” Representative Brooks: "International law.” Colonel Dinsmore: “Yes, sir.”); U.S. Army Jag, Law of War Handbook 20 (Maj. Keith E. Puls ed., 2005) (identifying “customary international law” — that is, "the 'unwritten' rules that bind all members of the community of nations” during war as one of the two major sources of the law of war, along with conventional international law); Manual for Courts-Martial United States, at 1-1 (2012) (“The sources of militaiy jurisdiction include the Constitution and international law. International law includes the law of war.”).

. Although customary international law, including the customary international law of war, contains some well-defined prohibitions at the core, the contours of customary international law are imprecise. That imprecision provides good reason for Congress and the Executive, when they want to outlaw violations of perceived international-law norms, to enact statutes outlawing specific conduct, rather than simply prohibiting violation of something as vague as "international law” or "the law of nations” or the "law of war.” Congress has done so in many recent statutes, including the Military Commissions Act of 2006. Pub. L. No. 109-366, 120 Stat. 2600 (2006). See also War Crimes Act of 1996, Pub. L. No. 104-192, 110 Stat. 2104; Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992); Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891.
At the same time, the imprecision of customary international law calls for significant caution by U.S. courts before permitting civil or criminal liability premised on violation of such a vague prohibition. Cf. Sosa v. AlvarezMachain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). A general prohibition against violations of "international law” or the "law of nations” or the "law of war” may fail in certain cases to provide the fair notice that is a foundation of the rule of law in the United States. Therefore, as the Supreme Court required in an analogous context in Sosa, and as the plurality suggested in Hamdan, imposing liability on the basis of a violation of "international law” or the "law of nations” or the "law of war” generally must be based on norms firmly grounded in international law. See Sosa, 542 U.S. at 724-38, 124 S.Ct. 2739; Hamdan, 548 U.S. at 602-03 & n. 34, 605, 126 S.Ct. 2749 (plurality). In *1251 this case, the asserted norm has no grounding in international law, much less firm grounding.