LIVINGSTON, Circuit Judge,
dissenting:
A petitioner must, at “all stages of federal judicial proceedings,” be able to demonstrate that he has “suffered!] or [is] threatened with[ ] an actual injury tracea *229 ble to the defendant and likely to be redressed by a favorable judicial decision.” Spencer v. Kemna, 528 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (quoting Lewis v. Cont’l Bank Corp., 494 U.S. 472, 478, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). Absent a concrete,'non-speculative, and re-dressable injury, a case ceases to present “a case or controversy under Article III ... of the Constitution.” Id. As we have long observed, “[fjederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.” Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) (citations omitted).
Robert Nowakowski cited a single collateral consequence in his initial habeas petition — the potential that a subsequent suit for damages under 42 U.S.C. § 1983 might not be successful absent habeas relief — a' consequence that the Supreme Court has previously determined to be insufficient to confer jurisdiction over a petition for habe-as corpus on a federal court.[1] See Spencer, 523 U.S. at 17, 118 S.Ct. 978 (discussing Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). The majority does not suggest that, under traditional Article III principles, Robert Nowakow-ski’s petition for habeas corpus would be justiciable. See Maj. Op. at 223 n.16. Instead, the majority concludes that this case is not moot for two interlocking reasons. First, in the majority’s view, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), requires that we apply a presumption of collateral consequences to Nowakowski’s conviction for committing a violation-level offense, notwithstanding the Supreme Court’s suggestion in Spencer that such a presumption accords with Article III principles only when it is a “presumption of significant collateral consequences” that “comport[s] with reality.” 523 U.S. at 12, 118 S.Ct. 978 (emphasis added). Next, having extended this presumption further than the Supreme Court has ever extended it, the majority applies the presumption in a way that makes it all but irrebuttable, concluding that a single unlikely consequence — the remotest risk of impeachment (more remote than the risks rejected as insufficient to create jurisdiction in Spencer, 523 U.S. at 14-17, 118 S.Ct. 978) — suffices to defeat mootness here.
I would hold that, because application of a “presumption of significant collateral consequences” to a conviction for a violation-level offense in New York “is [not] likely to comport with reality,” Supreme Court precedent neither requires nor permits us to extend that presumption to the category of judgment at issue here. Id. at 12, 118 S.Ct. 978. Assuming, arguendo, that such a presumption does apply, I would further find that the Government has clearly rebutted it. Accordingly, I would dismiss Nowakowski’s petition as moot.
I.
Robert Nowakowski was convicted of harassment in the second degree, a violation-level offense in New York (specifically denominated a “petty offense,” rather than a “crime”) for which the maximum *230 punishment is fifteen days’ incarceration and/or a $250 fíne. See N.Y. Penal Law § 10.00 (defining four categories of “offenses,” including “[t]raffic infraetion[s],” “[v]iolation[s],” “[m]isdemeanor[s],” and “[f]elon[ies],” the latter two of which are formally labeled “[c]rime[s]”); id. § 240.26 (defining harassment in the second degree as a “violation”); N.Y. Crim Proc. L. § 1.20(39) (defining “[p]etty offense” to mean “a violation or traffic infraction”); N.Y. Penal Law § 80.05(4) (articulating the maximum fine).[2] Nowakowski was originally sentenced to pay a $100 fíne. Several years after his initial sentencing, however, and just prior to his filing suit pursuant to 42 U.S.C § 1983 seeking money damages for alleged violations of his constitutional rights in connection with his conviction, he successfully moved the New York court to resentence him to a year of conditional discharge with the sole condition of mandatory attendance at a day of community service.[3]
Days before he was to perform his community service, Nowakowski filed a petition for habeas relief. Likely aware that he would complete his sentence prior to adjudication of his habeas motion, cf. Spencer, 523 U.S. at 7,' 118 S.Ct. 978 (noting that, once a sentence expires, a petitioner must point to “some concrete and continuing injury ... if the suit is to be maintained” (citing Carafas v. LaVallee, 391 U.S. 234, 237-38, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968)), Nowakowski asserted a single collateral consequence to defeat mootness: that, absent favorable termination in his habeas proceeding, he might be unable successfully to pursue his damages suit, cf. id. at 17, 118 S.Ct. 978 (dismissing this argument as “a great non sequitur”).[4] At no point — either before the district court or before this Court on appeal — did Nowa-kowski argue that a presumption of collateral consequences did or should apply to his violation-level conviction, an offense sufficiently low-level as not to be labeled criminal by New York State.[5]
*231 The Government, in addition to arguing that a Heck bar (whether or not it would exist here) is not a sufficient collateral consequence to keep Nowakowski’s petition alive, argued that a violation-level conviction, which is not denominated a crime, does not, as a categorical matter, entail sufficient collateral consequences to support federal jurisdiction.[6] A conviction for a violation-level offense in New York does not disqualify a defendant from voting, see N.Y. Elec. Law § 5-106, or from serving on a jury, see N.Y. Jud. Law § 510. Nor does it appear generally to disqualify a person from engaging in any type of employment.[7] In general, the records of any *232 arrest and prosecution that ends in conviction of a violation are sealed upon termination of the action, or destroyed or returned to the defendant. See N.Y. Crim. Proc. Law § 160.55. Such a conviction does not automatically enhance a future sentence under New York law, see N.Y. Penal Law § 70.06 (enhancing a sentence on the basis of a prior felony conviction), or under federal law, see U.S.S.G. § 4A1.2(c) (excluding prior non-felony offenses for purposes of calculating a Guidelines level if they appear on a list of petty offenses or are “similar to [those offenses appearing on the list]” unless “(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense”).
The district court, having no argument before it that a presumption of collateral consequences should apply, and having been presented with no reference to impeachment in any of Nowakowski’s initial briefs, dismissed his petition as moot on the simple basis that Nowakowski’s single alleged consequence — a potential Heck bar — had “no effect on” the mootness analysis. App’x at 3. The majority revives No-wakowski’s petition, concluding that a presumption of collateral consequences (which Nowakowski himself did not argue should apply) applies, and that Nowakowski’s petition is thus not moot. The majority holds that Supreme Court precedent mandates such a result. Analysis of this precedent suggests, instead, that the majority, far from applying the presumption as the Court has previously applied it, has extended it — and that this extension is unwarranted on the basis of the holdings and reasoning of Sibron and Spencer.
II.
A.
The genesis of this case can be tied to two Supreme Court cases, both decided in 1968. In Carafas v. LaVallee, the Supreme Court held that the fact that a habeas petitioner’s sentence had expired would not render his petition for habeas relief moot as, though his incarceration itself could no longer be remedied, he nevertheless faced collateral consequences as a result of his convictions for two felonies— burglary and grand larceny. 391 U.S. at 236-37, 88 S.Ct. 1556. As support for its conclusion, the Court cited numerous consequences that flowed from these convictions, observing that “[the petitioner could not] engage in certain businesses^] ... serve as an official of a labor union for a specified period of time[,] ... vote in any election held in New York State[,] ... [or] serve as a juror.” Id. at 237, 88 S.Ct. 1556. “Because of these [consequences, the petitioner had] ‘a substantial stake in the judgment of conviction which survive[d] the satisfaction of the sentence imposed on him.’ ” Id. (quoting Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196 (1946) (in which a conviction rendered a petitioner “liable to deportation and denial of naturalization, and ineligible to serve on a jury, vote, or hold office,” Spencer, 523 U.S. at 9, 118 S.Ct. 978)).
One month later, the Court decided Si-bron, which, though in the context of a direct appeal, extended the reasoning in Carafas and Fiswick and articulated the presumption that the majority applies here. In Sibron, the Court faced the ques *233 tion whether an appellant’s completion of his sentence — six months in jail for conviction of unlawful possession of heroin — rendered his appeal moot.[8] See 392 U.S. at 40, 88 S.Ct. 1889. Relying primarily on three cases, Fiswick, United States v. Morgan, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), and Pollard v. United States, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), each of which specifically addressed the collateral consequences of felony convictions, see, e.g., Fiswick, 329 U.S. at 222, 67 S.Ct. 224 (“[UJnless pardoned, [the defendant will] carry through life the disability of a felon[,] and by reason of that fact he might lose certain civil rights.”); Pollard, 352 U.S. at 358, 77 S.Ct. 481 (relying on Morgan and Fiswick’s discussion of the civil disabilities associated with felony convictions to observe that “[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits”), Si-bron determined that it did not.
The Sibron Court began by suggesting that Pollard “acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.” Sibron, 392 U.S. at 55, 88 S.Ct. 1889. It then, “without pausing to canvass the possibilities in detail,” proceeded to describe specific potential consequences that could flow from the conviction at issue in Sibron itself. Id. These included the two consequences that the majority highlights — that the conviction could “be used to impeach [Sibron’s] character should he choose to put it in issue at any future criminal trial [and] ... that [the conviction] must be submitted to a trial judge for his consideration in sentencing should Sibron again be convicted of a crime.” Id. at 55-56, 88 S.Ct. 1889. The Court noted, however, that “[t]here are doubtless other collateral consequences”— a proposition likely true in the context of a serious misdemeanor conviction and certainly true in the context of the felonies at issue in the precedent on which Sibron built its holding. Id.; see also Perez v. Greiner, 296 F.3d 123, 125 (2d Cir. 2002) (observing that, “in Sibron[], the Court, citing various collateral consequences such as deportation, inability to become a citizen, impeachment evidence in future criminal trials, and increased future sentences, asserted a presumption that collateral consequences attach to criminal convictions post-release”).
In the decades that followed, the Court applied the presumption articulated in Si-bron in the context of felony convictions, at no point applying it to an offense as categorically low-level as Nowakowski’s, nor to any offense even arguably not designated a “crime.”[9] Even as the Court continued to apply the presumption to felony convictions, moreover, it issued two decisions limiting the presumption’s scope and even questioning its application in any circumstances.
First, in Lane v. Williams, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982), the Court assessed whether respondents’ attack on their sentences to parole terms was rendered moot when these terms expired.[10] The Lane Court did not explicitly *234 discuss the applicability or non-applicability of a “presumption of collateral consequences.” It did, however, find the case moot. The Court began by observing that, in Carafas, numerous collateral consequences associated with the felony conviction there (including, in that case, disenfranchisement) “were sufficient to ensure that the litigant had” a constitutionally sufficient personalized stake. Id. at 632, 102 S.Ct. 1322 (quoting Carafas, 391 U.S. at 237, 88 S.Ct. 1556). The Court then concluded that the “doctrine of Carafas and Sibron [was] not applicable in this case” because “[n]o civil disabilities such as those present in Carafas result from a finding that an individual has violated parole.” Id. In contrast to the “statutory consequences” Carafas discussed, “a finding that an individual has violated parole,” the Court observed, at most leads to “non-statutory consequences” — including adverse employment prospects or the potential that “the sentence imposed in a future criminal proceeding, could be affected.” Id. Such consequences would depend on “discretionary decisions” of an employer or sentencing judge. Id. at 632-33, 102 S.Ct. 1322. The Court further noted that the potential that parole violations might be “considered in a subsequent parole determination” was also insufficient to defeat mootness: Carafas “concerned existing civil disabilities,” but the finding that the respondents violated their parole could not “affect a subsequent parole determination unless [they] again violate[d] state law, [were] returned to prison, and bee[a]me eligible for parole,” a sequence of events “Respondents themselves [would be] able — and indeed required by law — to prevent.” Id. at 632 n.13, 102 S.Ct. 1322 (emphasis added). Further, such a finding, did not in and of itself render someone ineligible for future parole, but was “simply one factor, among many” that might be considered. Id. Finally, the Court observed: “Collateral review of a final judgment is not an endeavor to be taken lightly. It is not warranted absent a showing that the complainant suffers actual harm from the judgment that he seeks to avoid.” Id.
In Spencer, the Supreme Court addressed whether a petitioner’s challenge to an order revoking his parole — an order based, inter alia, on a finding that he had committed forcible rape — was rendered moot when the petitioner’s sentence expired. Unlike Lane (which found the petition moot but did not expressly analyze whether a presumption applied), the Court began by explicitly concluding that a presumption of collateral consequences is not appropriately applied to a parole revocation. See 523 U.S. at 8, 118 S.Ct. 978. In so concluding, the Supreme Court criticized the presumption as applied even to criminal convictions, but it did not overturn it. It did, however, explain why the Sibron Court had applied a presumption in that case. First, Spencer noted that the Sibron Court’s understanding of standing and mootness was based on a then-dominant view of such Article III doctrines as simply ensuring the sharpening of issues, a “parsimonious view” that “ha[d] since yielded to the acknowledgment that” such doctrines constitute a vital “means of de-fin[ing] the role assigned to the judiciary in a tripartite allocation of power.” Id. (quoting Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). Second, the Court explained that “it is an ‘obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences,’ ” id. at 12, 118 S.Ct. 978 (quoting Sibron, 392 U.S. at 55, 88 S.Ct. 1889), a proposition which meant that, in the con *235 text of such convictions, “the presumption of significant collateral consequences is likely to comport with reality.” Id. The Court then explained why such a presumption should not apply to Spencer’s parole revocation: unlike “most criminal convictions,” such adjudications were not categorically likely to entail significant collateral consequences. Id.
Having determined that a presumption of collateral consequences would not apply, the Court proceeded to examine, inter alia, five alleged consequences claimed by the petitioner, finding each inadequate to create a case or controversy. First, the Court held that the possibility that the revocation could be used to the petitioner’s detriment in some future parole proceeding was a mere “possibility rather than a certainty or even a probability.” Id. at 14, 118 S.Ct. 978. Second, while agreeing that “the Order of Revocation could be used to increase [the petitioner’s] sentence in a future sentencing proceeding,” the Court observed that such a possibility was too remote as “it was contingent upon respondents’ violating the law, getting caught, and being convicted.” Id. at 15, 118 S.Ct. 978. Third and fourth, though the Court did not disagree that the order might “be used to impeach [the petitioner] should he appear as a witness or litigant in a future criminal or civil proceeding,” id. (emphasis added); or “used against him directly, pursuant to [the federal rules of evidence],” it held that, because such impeachment would turn on various “ ‘discretionary decision[s]’ ” of the prosecutor or adverse counsel, id. at 16, 118 S.Ct. 978 (quoting Lane, 455 U.S. at 632, 102 S.Ct. 1322); as well as the similarly discretionary decision of the “presiding judge” to admit such evidence, the possibility was overly remote, id. Finally, the Court addressed the petitioner’s argument that, absent habeas relief, he would be unable to pursue a claim for damages under 42 U.S.C. § 1983. The Court concluded that such an argument was “a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available.” Id. at 17, 118 S.Ct. 978. Having determined that the consequences on which Spencer relied (consequences of substantially greater severity than the consequences at issue here) were insufficient to create a case or controversy, the Court dismissed the petition as moot.
B.
As framed by the majority, this case requires us to determine whether the presumption of collateral consequences applied in cases like Sibron should be extended as well to a conviction for a violation-level offense in New York. I would hold that because such an offense, unlike the judgments to which the Court has previously applied such a presumption, is not likely to entail significant collateral consequences, such extension is not warranted. I reach this conclusion for two interrelated reasons.
First, as is evident from the above description of the Sibron line, the Supreme Court has never before applied a presumption of collateral consequences to a judgment as low-level as Nowakowski’s (whether or not denominated “criminal”) — nor, for that matter, to a conviction properly labeled a “petty offense” as that term is understood in constitutional parlance.[11] The lowest-level offense to which the Court has previously applied the presump *236 tion was the offense in Sibron itself — unlawful possession of heroin, a misdemeanor for which Sibron received a six months’ sentence.[12] 392 U.S. at 45 n.1, 88 S.Ct. 1889. In the years since, the Court has consistently applied the presumption only to felony convictions — a consistency that made it possible for Spencer convincingly to observe that the “presumption of significant collateral consequences [was] likely to comport with reality.” Spencer, 523 U.S. at 12, 118 S.Ct. 978. This factual consistency is relevant to whether such a presumption should — and certainly need — apply here. Cf. Powers v. Hamilton Cty. Pub. Def. Comm’n, 501 F.3d 592, 602 (6th Cir. 2007) (distinguishing “the ordinary rule refinement that appellate courts necessarily engage in [from] an improper departure from binding Supreme Court precedent,” in the context of distinguishing a prior Supreme Court case that did not address the same “factual scenario”).[13]
Second, the reasoning of Sibron and Spencer confirms that this is a factual *237 distinction with a difference — that while such a presumption might be appropriate in the context of a more serious conviction, it is not appropriate as applied to the category of judgment here. In Sibron, the Court “acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.” 392 U.S. at 55, 88 S.Ct. 1889. In justifying its approach to mootness, the Court then briefly analyzed the consequences that might flow from the defendant’s conviction. In the Court’s view, it was not just that the conviction could be used to impeach the defendant and for purposes of sentencing enhancement — the Court plausibly observed that “[tjhere [were] doubtless other collateral consequences.” Id. at 56, 88 S.Ct. 1889. In contrast, Spencer, in declining to apply a presumption of Collateral consequences to a parole revocation, concluded that application of a presumption to such revocations, unlike application of a presumption to the convictions at issue in Sibron and its progeny, would not be “likely to comport with reality.” Spencer, 523 U.S. at 12, 118 S.Ct. 978; see also Lane, 455 U.S. at 632-33, 102 S.Ct. 1322 (distinguishing the parole revocation from the convictions in Sibron and-Carafas not because the former was not “criminal” or a “conviction,” but because “[n]o civil disabilities such as those present in Carafas result from a finding that an individual has violated parole”). The reasoning in Spencer — which in turn characterized the cases that came before it — was thus as follows: first, the Sibron presumption was justified because collateral consequences were categorically likely to flow from convictions; and second, such consequences were less likely to flow from parole revocations, rendering a parallel presumption fundamentally inconsistent with our obligations under Article III. This Court, moreover, in deciding whether to extend the presumption to a new category of judgment, has described the reasoning of Sibron, Spencer, and Lane in precisely this way. See United States v. Mercurris, 192 F.3d 290, 293 (2d Cir. 1999).[14]
*238 In light of the Court’s prior holdings, and the reasoning of Sibron and Spencer, it is perfectly evident that a presumption of collateral consequences cannot logically be extended to a violation-level offense in New York. This is because the general consequences of such an offense are not only categorically less severe than the consequences logically associated with the convictions to which a presumption was applied in Sibron and its progeny, but also than those associated with parole revocations.[15] Parole revocations, after all, can result in a mandated federal sentencing enhancement. See U.S.S.G. § 4A1.2(k). In contrast, even assuming that the mere .risk of a sentencing enhancement is sufficient to justify application of a presumption after Lane and Spencer, cf. United States v. Dominguez-Carmona, 166 F.3d 1052, 1059-60 (10th Cir. 1999) (Lucero, J., concurring) (“[T]he Supreme Court in Spencer[] .... cast into doubt the practice of using highly speculative collateral consequences to stave off mootness ....”); Mercurris, 192 F.3d at 294 (declining to apply a presumption to a determination that a conviction is an aggravated felony, as, *239 post-Spencer, “a finding of collateral consequences cannot be based on the speculation that an individual will receive an enhanced sentence in a future sentencing proceeding in connection with a crime he has not yet committed”), there is minimal risk of such enhancement with prior violations, see N.Y. Penal Law § 70.06; U.S.S.G. § 4A1.2(c).[16] As the majority observes, there may be some risk of impeachment associated with conviction of a violation-level offense — though only, it seems, in state criminal court. See Maj. Op. at 225-26. Even if evidence rules permit introduction of a violation-level conviction just as they would permit introduction of a more serious offense, however, the risk of impeachment actually occurring is not logically commensurate.[17] And Spencer makes clear that some small risk of impeachment is simply not enough to render a presumption appropriate.[18]
In short, it is not simply that a violation-level offense is factually distinct in severity from the offenses to which the Court has previously applied a presumption. It is that the way that such an offense, not denominated a crime in New York State, is distinct distinguishes it from those convictions and makes evident that no presump *240 tion should apply.[19] Indeed, the basic logic of applying a presumption of collateral consequences to a serious conviction clearly forecloses application of such a presumption here. To the degree that the Court has “presum[e]d” significant consequences, it has done so because they are likely; and to the degree that the Court has “count[ed] collateral consequences that are remote and unlikely to occur,” it has done so both because such consequences invariably sit beside other unstated, and unacknowledged likely consequences, and because the seriousness of the convictions at issue suggests that even consequences that may appear remote are more likely to occur than might be apparent. Spencer, 523 U.S. at 8, 118 S.Ct. 978.[20] This is not to say that application of a presumption of collateral consequences even to relatively serious adjudications does not sit “uncomfortably” beside traditional principles of Article III, as the Spencer majority understood. Id. at 10-11, 118 S.Ct. 978. But there is only limited discomfort, as long as the presumption is confined to such a context. In contrast, to apply a presumption to an adjudication like the one here is to require courts to presume the existence of an injury when such injury is not likely to exist. Applied in such a manner, the presumption becomes an arbitrary mechanism for the manufacture of cases and controversies that will inevitably require federal courts to hear cases on the merits in contravention of their obligations under Article III. That is the reasoning and sense of the cases from Sibron to Spencer — reasoning and sense from which the majority today departs.[21]
*241 C.
The majority does not necessarily dispute that, were we to assess the question on a blank slate, we might plausibly hold that extension of a presumption of collateral consequences to violation-level convictions contravenes our obligations under Article III and is inconsistent with the reasoning and outcome in Spencer. Instead, the majority’s primary argument is that precedent requires application of a presumption here, because the Supreme Court used the term “criminal conviction” in cases like Sibron and Spencer without qualification, and because Nowakowski’s conviction is arguably penal in character for purposes of ascertaining whether certain constitutional protections attach. See Maj. Op. at 218-22, 228. At the start, to the degree that there is even doubt that the judgment in this case was the sort contemplated by Sibron and Spencer, Spencer’s admonition against extending the presumption should resolve the inquiry here. Nevertheless, the majority’s reading of the Court’s precedent — as well its approach to explicating those holdings — is flawed on its own terms.
First, the majority’s invocation of the words “criminal conviction” in precedent like Sibron and Spencer divorces these words from their factual context and thus exaggerates the scope of the Court’s prior holdings. As already noted, the Court has never applied the presumption to a judgment as categorically unlikely to entail collateral consequences' as Nowakowski’s petty offense, nor indeed even to any misdemeanor conviction apart from the one in Sibron itself. Even if this factual consistency did not strongly indicate that a presumption should not be applied in this case, it certainly belies any suggestion that the Court, in using the term “criminal conviction” without qualification, has already effectively resolved the inquiry before us. See Kokkonen, 511 U.S. at 379, 114 S.Ct. 1673 (noting that the “holding [of a prior case] was not remotely as permissive as its language,” and that “[i]t is to the holdings of our cases, rather than their dicta, that we must attend”); Powers, 501 F.3d at 602.
Second, even if we were to treat the words “criminal conviction” as talismanic, notwithstanding the actual holdings in which such words appear, there is still no reason to believe that the scope of this phrase includes the judgment here. The meaning of these words must be ascertained in context. Cf. United States v. Balsys, 524 U.S. 666, 673, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998) (holding that the text “any criminal case” under the Fifth Amendment’s Self-Incrimination Clause does not generally include criminal cases in foreign jurisdictions, and noting that the textual argument to the contrary “overlooks the cardinal rule to construe provisions in context”). The Supreme Court has *242 often used the short-hand “criminal conviction,” moreover, when context makes perfectly clear that it can only have meant felony conviction or, in some cases, a serious misdemeanor. For instance, in North Carolina v. Rice, the Court observed, without citing Sibron, that “[a] number of disabilities may attach to a convicted defendant even after he has left prison, and the Court has recognized the standing of such persons to challenge the legality of their convictions even when their sentences have been served.” 404 U.S. 244, 247, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). In a footnote, the Court then supported this statement by citing numerous consequences that would generally apply only to felonies, including disenfranchisement. See id. at 247, n.1, 92 S.Ct. 402 (citing, inter alia, Comment, Civil Disabilities of Felons, 53 Va.L.Rev. 403 (1967)). The Court nowhere qualified the term conviction with the words “felony” or “serious,” but no matter — the meaning was clear enough from context.
Further, in interpreting the ambit of constitutional rights, the words “criminal conviction,” “crime,” or “criminal prosecution” have frequently been used without qualification to announce the scope of a given right; notwithstanding such pro-nouneements, the Court has subsequently held that these rights do not apply to all criminal convictions as that term might be used in other contexts — in particular distinguishing more serious convictions from petty offenses. See Lewis v. United States, 518 U.S. 322, 325, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) (observing that, though the Sixth Amendment is clear that “[i]n all criminal prosecutions, the accused shall enjoy the right to ... trial, by an impartial jury,” “there is [nevertheless] a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision” (first quoting U.S. Const. Am. VI; then quoting Duncan v. Louisana, 391 U.S. 145, 159, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)); see also Duncan, 391 U.S. at 160, 88 S.Ct. 1444 (“So-called petty offenses ... have always been held to be exempt from the otherwise comprehensive language of the Sixth Amendment’s jury trial provisions[, in part because] .... [t]he possible consequences to defendants from convictions for petty offenses have been thought insufficient tó outweigh the benefits to efficient law enforcement and simplified judicial administration resulting from the availability of speedy and inex-r pensive nonjury adjudications”).[22] The ma *243 jority’s determination that “criminal conviction” includes a low-level judgment like Nowakowski’s (denominated a petty offense, and not criminal, by the State of New York) thus does not obviously flow from the Supreme Court’s references to “criminal conviction” in cases like Sibron and Spencer, absent some ability to square this outcome with the context, logic, and reasoning of these decisions.
Yet the majority’s approach to this inquiry fails this test. The majority concludes that the Court’s references to “criminal conviction” in Sibron and Spencer necessarily require that a presumption apply whenever a conviction is functionally criminal “for purposes of determining the proper applicability of [certain] federal constitutional protections,” Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 630, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988), regardless whether collateral consequences are likely to flow from the judgment in question. But beyond the word “criminal,” this approach derives no obvious support from either case. Moreover, it is an illogical — and thus extremely unlikely — approach to explicating the term “criminal conviction” as used in the context of this Article III precedent for at least two reasons.
First, the determination that a given matter should be treated as criminal for the purpose of a particular constitutional protection does not suddenly transform that adjudication into a criminal conviction for purposes of a state’s collateral consequences regime: it does not, in other words, change the status of the proceeding for purposes of enhancement provisions, impeachment laws, felony impairments, or the other collateral legal consequences animating cases like Sibron and Carafas. Indeed, it is not clear how the majority’s analysis in any way illuminates the actual collateral consequences flowing from an adjudication. It is perhaps for this reason that the Fifth Circuit recognized in Port v. Heard, 764 F.2d 423 (5th Cir. 1985), in the context of discussing civil and criminal contempt, that the “mootness of contempt judgments turns, not on the formalistic enterprise of labeling the contempt judgment, but on the presence vel non of a live controversy.” Compare id. at 427, with Feiock, 485 U.S. at 627, 108 S.Ct. 1423 (assessing whether a contempt proceeding was functionally civil or criminal).
Second, the doctrine on which the . majority relies is not only irrelevant to the assessment of mootness: it is, in fact, counterproductive. The analyses in cases like Feiock address principally the necessity of ensuring, through careful doctrinal elaboration, that states cannot evade specific constitutional criminal protections afforded to the accused through mere nomenclature — that they cannot, by denominating a proceeding or penalty as civil, for instance, evade- specific criminal procedural protections that would otherwise attach. In contrast, however, a state’s designation of an offense as noncriminal may often be relevant to mootness (and indeed is relevant here), and mootness serves not as a protection afforded to individuals in the crimi *244 nal process, but as a limitation on courts, confining the judiciary to its constitutionally defined role. See Spencer, 523 U.S. at 11, 118 S.Ct. 978. For these reasons, I am hard-pressed to agree with the majority that the Supreme Court intended, in using the words “criminal conviction” in the context of serious convictions, to require courts faced with difficult questions at the edge of mootness to resolve such questions not through appeal to the existence of a controversy, but through application of precedent created in an unrelated context for unrelated reasons, and that is not grounded in the animating limitations of Article III.
In short, I believe that the question whether a presumption of collateral consequences applies to a violation-level offense is an unresolved one in our jurisprudence that does not logically turn on whether or not certain constitutional protections unrelated to mootness apply. As the question before us is thus whether to extend the presumption to a new category of adjudication, I would conclude that the presumption may not be applied to a violation for the simple reason that it does not “comport with reality” to presume that “significant collateral consequences” will necessarily flow from such an offense across the 'range of cases. Spencer, 523 U.S. at 12, 118 S.Ct. 978.
III.
The preceding conclusion is sufficient to resolve this matter since, absent a presumption, the risk of impeachment in a future proceeding to which the majority alludes is clearly inadequate, under Spencer, to deem this a live case. See id. at 16, 118 S.Ct. 978 (deeming analogous risk of impeachment “purely a matter of speculation”). Even if I agreed with the majority that a presumption of collateral consequences applies, however, I believe it is also clear that the Government has rebutted it here.[23]
As an initial matter, I disagree with the majority’s understanding of the standard of proof that the Government must meet to rebut the presumption. The majority observes that a petitioner may present any consequence that is “merely hypothetical and speculative,” Maj. Op. at 225, and then cites language from Sibron that a petition is moot only if the government can show that “there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.” Sibron, 392 U.S. at 57, 88 S.Ct. 1889. But if one were to take this statement — and thus this “standard of proof,” Maj. Op. at 224— *245 literally, the necessary result would almost certainly be that the presumption is functionally irrebuttable.[24]
The majority expressly disclaims that its presumption is irrebuttable, a conclusion it reaches, sensibly, on its reading of Spencer. See Maj. Op. at 224-25; see also Meister, 2007 U.S. Dist. LEXIS 98605, at *12 (observing that the “presumption [of collateral consequences] ... should be viewed in light of the Spencer Court’s plainly stated reluctance to find collateral consequences absent a showing of some concrete statutory disability flowing from the conviction being attacked”). Yet once one concedes, as the majority does, that this standard cannot be taken literally and that Spencer necessarily had an effect on the strength of the presumption, one is left wondering why the majority invokes the Sibron language at all. I believe a better view is that the Government, to rebut the presumption, need show only that there is no reasonable possibility of any significant collateral consequences. Such a standard comports both with Spencer*s express construction of the presumption, see 523 U.S. at 12, 118 S.Ct. 978 (referring to Sibron as creating a “presumption of significant collateral consequences” (emphasis added)), as well as with the reasoning in Spencer itself. And such a standard would surely require us to find this case moot.
Yet even if one adopts the majority’s articulation of the standard, it follows that, in affirming that this presumption is rebut-table, the majority too is not taking the text literally. In other words, eyen as the majority cites this standard as support for its holding, it necessarily has implicitly drawn — and other courts will have to explicitly draw — some line. To the degree then that the majority agrees that a line must be drawn — that it is not actually the case that the Government must show “no possibility [of] any collateral legal consequences” — I see no justification for the majority’s conclusion that the risk of impeachment in this case should fall above that line for two reasons.
First, that risk should not be viewed in a vacuum, but in the context of the Government’s broader analysis of the consequences of a violation-level offense. The majority observes that the “effect of the presumption is to accept a broader category of consequences as sufficient for purposes of avoiding mootness.” Maj. Op. at 223. Yet to the degree that the Court has accepted speculative consequences before, it has done so in the context of more serious convictions, and in the context of a presumption whose central premise is that many consequences flow from a given conviction, even if only one or two are specifically named by the Court. See Sibron, 392 U.S. at 56, 88 S.Ct. 1889. Even if the Government’s categorical analysis of a violation-level offense is not enough to avoid application of the presumption, it cannot *246 be irrelevant as well at the rebuttal stage, and it has not been irrelevant to other courts. See, e.g., Meister, 2007 U.S. Dist. LEXIS 98605, at *12.
Second, even assuming a risk of impeachment in a vacuum is sufficient to create a justiciable controversy, the risk of such impeachment — though not nonexistent — is substantially lower in this case than in Spencer or any other Supreme Court case in which the Court has cited impeachment as the material consequence.[25] Indeed, the very fact that New York does not label violations as crimes, while not dispositive of whether such offenses are “criminal” for purposes of certain constitutional protections, is surely relevant to the likelihood that the series of discretionary decisions necessary to result in use of that conviction to impeach Nowa-kowski would occur. See Spencer, 523 U.S. at 13, 118 S.Ct. 978. Even if the Court has accepted speculative or hypothetical consequences when assessing the consequences of convictions, that does not mean that any consequence, no matter how speculative or hypothetical, is sufficient to make a case justiciable. If that is so, the presumption is not rebuttable.
In short, even assuming a presumption to apply, it would seem the Government has rebutted it here. In holding otherwise, I fear that the majority — even as it claims the mantle of reasonableness in suggesting that this presumption is rebuttable — erects a wall so high that it is only in the rarest case that the Government will ever be able to leap it. Taken by itself, súch an approach to rebuttal is problematic. Viewed in concert with the majority’s initial determination that a presumption may apply to an offense even when that offense is unlikely to entail significant consequences, this approach guarantees that the presumption will be applied, as it has been in this very case, in a way that invents, out of thin air, federal jurisdiction. See Kokko-nen, 511 U.S. at 377, 114 S.Ct. 1673; Larche v. Simons, 53 F.3d 1068, 1069-70 (9th Cir. 1995).[26]
*247 IV.
In light of my analysis of mootness, I would not reach the question whether No-wakowski was in custody at the time he filed his habeas petition. I note, however, that to the degree that the majority is correct that a penalty of a day of community service — and presumably commensurate penalties — may confer upon a federal district court jurisdiction to overturn a state conviction, it follows that most petitioners in Nowakowski’s position will be seeking the writ primarily, or even exclusively, to remedy collateral consequences.[27] It is not obvious to me that this result is consistent with the Supreme Court’s recognition that “[t]he custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty,” Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., 411 U.S. 345, 351, 93 S.Ct. 1571; 36 L.Ed.2d 294 (1973), and neither the Supreme Court, nor our Court, has previously found a restraint of commensurate severity to constitute custody.[28] But *248 be that as it may, if habeas, an “extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism,” id. has transformed, for some petitioners, from a remedy of severe deprivations of liberty to a mere tool through which a petitioner may challenge the collateral consequences of a conviction or adjudication, then it is all the more important that we ensure that the petition presents a live case or controversy when analyzing those collateral consequences.
I respectfully dissent.

. Before the district court, Nowakowski did not raise the possibility that his conviction might be used to impeach him in a future court proceeding until his second reply letter to the Government's motion to dismiss his petition as moot. See Second Letter from Robert Nowakowski in Opp. to Gov’t’s Mot. to Dism. on Mootness Grounds at 1, Nowakow-ski v. New York, No. 13-cv-3709(ENV)(LB) (E.D.N.Y. May 30, 2014), ECF No. 22 (“Second Nowakowski Letter”).

.A defendant may be convicted of harassment in the second degree for, inter alia, "followfing] a person in or about a public place” and “engag[ing] in a course of conduct ... which ... seriously annoy[s] [anjother person.” N.Y. Penal Law § 240.26. Other violation-level offenses in New York include disorderly conduct, see id. § 240.20 (defining the offense to include, inter alia, "obstructing] vehicular or pedestrian traffic”); loitering, see id. § 240.35 (including when a person "remains in any transportation facility [without authorization] ... for the purpose of entertaining persons by singing, dancing or playing any musical instrument”); and “[u]nlawfully posting advertisements,” see id. § 145.30 (including when a person, "having no right to do so nor any reasonable ground to believe that he has such right, ... posts, paints or otherwise affixes to the property of another person any advertisement, poster, notice or other matter designed to benefit a person other than the owner of the property”). New York is not alone in distinguishing "crimes” from more petty violations. See, e.g., 18 Pa. C.S.A. § 106 (listing felony, misdemeanor, and “summary offenses," the latter including offenses expressly designated as such as well as offenses for which "the maximum [term of incarceration that may be imposed] is not more than 90 days”); see also id. § 6708 (designating "[r]et[aining] library property after notice to return” a summary offense).

. The majority observes that the "Notice of C.S. Obligation” Nowakowski received indicated that .the date for performance could not be rescheduled. Maj. Op. at 217. This is so, but it is also the case that the sentencing court explicitly solicited Nowakowski’s input in selecting the day, asking whether “[a]ny particular day work[ed] for [him]” and indicating that the individuals who would schedule the day would "ask [Nowakowski]” what he would prefer. Gov’t App’x at 6.

. In his second reply letter to the Government’s motion to dismiss on mootness grounds, Nowakowski briefly noted that the conviction might be used to impeach him in a future court proceeding. See Second Nowa-kowski Letter, supra, at 230.

. Where a petitioner — even a pro se petitioner — fails to make a particular argument before our Court — let alone fails to make the argument before our Court and the district court — we generally deem the argument waived. Cf. Fleming v. United States, 146 F.3d 88, 90 (2d Cir. 1998) (noting, in a case where the petitioner failed to allege in the district court any continuing legal consequences sufficient to permit his petition for coram nobis relief to survive, but did cite such consequences on appeal, that, though "a district court must review a pro se petition for collateral relief 'with a lenient eye, allowing borderline cases to proceed,’ [w]here ... a petition fails even vaguely to suggest an essential element of a claim for relief, the district court is not required to overlook the deficiency” (quoting Williams v. Kullman, 722 F.2d 1048, 1050 (2d Cir. 1983)); LoSacco v. City of Mid-dletown, 71 F.3d 88, 93 (2d Cir. 1995) ("[W]e need not manufacture claims of error for an appellant proceeding pro se, especially when he has raised an issue below and elected not to pursue it on appeal.”). Though a party cannot waive a challenge to the court's jurisdiction, that does not mean that a party cannot waive a particular argument as to why the court would have jurisdiction. See, e.g., Diaz v. State of Florida Fourth Jud. Circ. ex rel. Duval Cty., 683 F.3d 1261, 1264 n.5 (11th Cir. 2012); see also Wenegieme v. Wells Fargo Home Mortg., 642 Fed.Appx. 67, 68 (2d Cir. 2016) (summary order) (finding that a pro se litigant’s failure to challenge on appeal a district court's findings in regard to its jurisdiction waived that challenge). The majority nevertheless decides the case on a ground not suggested by Nowakowski, either before the district court, or on appeal. As the majority addresses the argument, so do I.

. In suggesting that certain consequences are likely or unlikely to exist as a “categorical matter,” I mean to distinguish the general likelihood that collateral consequences will flow from a particular category of adjudication from the specific likelihood that a given petitioner may be facing a concrete harm. Though the latter question is always relevant to whether a petition is moot (whether or not one applies a presumption), the former is germane to whether application of a presumption of significant collateral consequences serves the purposes of Article III, or amounts to mere expansion of jurisdiction by "judicial decree.” Kokkonen, 511 U.S. at 377, 114 S.Ct. 1673. This distinction between asking whether a category of adjudication is likely, in the ordinary case, to entail significant collateral consequences, and whether a specific petitioner has sufficiently alleged harm is not my own. In Spencer, the Court held that parole revocations, as a category of adjudication, were insufficiently likely to entail significant collateral consequences in the ordinary case to merit a presumption of such consequences, see Spencer, 523 U.S. at 12, 118 S.Ct. 978, before asking whether the specific petitioner had presented sufficient consequences to defeat mootness, see id. at 14, 118 S.Ct. 978. Post-Spencer, we have consistently approached the question whether to apply a presumption to a new category of adjudication by asking whether, as a categorical matter, such a presumption would be warranted. See, e.g., United States v. Mercurris, 192 F.3d 290, 293-94 (2d Cir. 1999).

.See, e.g., N.Y. Jud. Law § 90 (observing that conviction of a felony results in immediate disbarment of an attorney and that conviction of a "serious crime” results in suspension— with the latter defined either as a crime that is a felony “under the laws of any state, district or territory or of the United States” though not in New York, or which has, as "a necessary element ... interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or con *232 spiracy or solicitation of another to commit a serious crime”); N.Y. Gen. Bus. Law § 89-ggg (empowering the state to take adverse action against an individual licensed to provide armored car services if that individual has, inter alia, been "convicted of a serious offense or misdemeanor which, in the discretion of the secretary, bears such a relationship to the provision of armored car services ... as to constitute a bar to licensure or renewal”).

. Sibron was initially charged with a felony but ultimately convicted of a misdemeanor. See Sibron, 392 U.S. at 45 n.1, 88 S.Ct 1889.

. See Minnesota v. Dickerson, 508 U.S. 366, 371 n.2, 113 S.Ct 2130, 124 L.Ed.2d 334 (1993); Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct 1668, 84 L.Ed.2d 740 (1985); Evitts v. Lucey, 469 U.S. 387, 391 n.4, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); Pennsylvania v. Mimms, 434 U.S. 106, 109 n.3, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); Benton v. Maryland, 395 U.S. 784, 790-91, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

.The respondents did not attack the convictions pursuant to which they had been sentenced, though they did seek effectively to *234 expunge findings that they had violated their parole. See id. at 631, 102 S.Ct. 1322.

. Our constitutional jurisprudence has long distinguished “petty offenses” from “crimes” within the meaning of the Sixth Amendment, and on the basis that the former are less likely to entail sufficiently serious consequences to justify application of certain constitutional protections. See infra pp. 242-43. The distinction arises in numerous contexts material to whether a judgment will entail collateral consequences. See, e.g., U.S.S.G. §4A1.2(c) (gen *236 erally excluding such offenses from criminal history calculations for Guidelines purposes). The Court, moreover, has expressly acknowledged the necessity of determining whether rules announced broadly as applicable to criminal cases necessarily apply as well to petty offenses. See Scott v. Illinois, 440 U.S. 367, 372, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979).

. Several lower courts have held that various lower-level misdemeanor convictions carried insufficient collateral consequences to support jurisdiction, though they have not always clarified whether they have applied a presumption of collateral consequences to such convictions. See e.g., Wickstrom v. Schardt, 798 F.2d 268, 270 (7th Cir. 1986) (per curiam) (though resolving the case on other grounds, expressing doubt that the petition was not moot, and observing that "[i]n Carafas, the felony conviction at issue resulted in disenfranchisement, disqualification for certain jobs and businesses, and many other serious legal consequences .... [, but the petitioner] does not allege that his misdemeanor convictions produce similar effects”); Broughton v. North, Carolina, 717 F.2d 147, 148-49 (4th Cir. 1983) (per curiam) (concluding that the habeas petition was moot because petitioner's conviction for criminal contempt, a misdemeanor pursuant to which petitioner had served a 30-day sentence, did not carry sufficient cognizable collateral consequences); cf., Mongeluzzo v. Henicks, 2014 WL 5685551, at *4 (W.D. Pa. Nov. 4, 2014) (collecting cases for the proposition that ‘‘[c]ourts have reached different conclusions regarding whether collateral consequences are presumed with respect to misdemeanor convictions”). The Ninth Circuit, in contrast, has explicitly held that a "presumption that collateral consequences flow [is applicable to] any criminal conviction,” Chacon v. Wood, 36 F.3d 1459, 1463 (9th Cir. 1994) (quoting Hir-abayashi v. United States, 828 F.2d 591, 605-06 (9th Cir. 1987)), though this holding has been criticized within the circuit, see Larche v. Simons, 53 F.3d 1068, 1070 (9th Cir. 1995), and at least one subsequent panel has assessed the mootness of a "petty misdemean- or” without, seemingly, applying a presumption, see United States v. Roblero-Solis, 588 F.3d 692, 698 (9th Cir. 2009) (though finding an appeal from a "petty misdemeanor[ ]" not moot, citing to Spencer for the proposition that "the prospect of a higher sentence” was insufficient, by itself, to render the case justi-ciable, and engaging in a discussion that would seem unnecessary were the panel to have applied Chacon's irrebuttable presumption).

. The majority argues that the Court’s analysis in Dickerson undermines my conclusion in this case, and is inconsistent with my description of the Court's practice as only applying the presumption to more serious adjudications. See Maj. Op. at 227; see also Dickerson, 508 U.S. at 371 n.2, 113 S.Ct. 2130. In Dickerson, the defendant was convicted of fifth-degree possession of a controlled substance, crack cocaine, a felony in Minnesota. See State v. Dickerson, 481 N.W.2d 840, 842 (Minn. 1992). He was then sentenced pursuant to Minn. Stat. § 152.18, a diversionary scheme which permits a court not to enter a public judgment of conviction, and generally mitigates many of the collateral consequences that would otherwise flow from such a conviction. See Dickerson, 508 U.S. at 371 n.2, 113 S.Ct. 2130. In assessing whether the State’s appeal was moot, the Court cited to *237 Sibron and observed that the reinstated judgment, though still subject to the diversionary sentence, could be used not only for various purposes in Minnesota, see id. (citing Minn. Stat. § 152.18(c) (noting, inter alia, that the record of the proceedings could be used “for purposes of a criminal investigation, prosecution, or sentencing”)), but also that the Eighth Circuit had concluded that it could "be included in calculating a defendant's criminal history category in the event of a subsequent federal conviction,” id.
The majority suggests that a presumption must apply in this case, as the specific consequences cited in Dickerson are arguably commensurate with those generally associated with a violation. But in comparing the specific consequences Dickerson faced as a result of committing a felony with the categorically likely consequences of a violation-level conviction, the majority conflates two inquiries: the ex ante determination whether to apply a presumption to a category of adjudication; and the specific question whether such a presumption has been rebutted in a particular case. To reiterate, Dickerson was charged with and convicted of a felony. See id. Though the sentence in Dickerson might have been relevant to whether the presumption was rebutted, it did not change the answer to the ex ante question, long resolved by the Court: whether the presumption is merited as applied to a felony conviction. The majority thus tries to stack the deck, comparing the rare felony case, where conviction may entail few collateral consequences, with the usual violation. Finally, to the degree that we were to compare the specific consequences Dickerson faced upon reinstatement of the judgment against him with the specific consequences Nowakowski faces, it is hardly obvious, as the majority suggests, that the consequences in Dickerson were less severe. For various state purposes, and for federal sentencing enhancement purposes, Dickerson's criminal conviction remained a felony conviction, which could lead to mandated sentencing enhancements.

. In Mercurris, we declined to presume the existence of collateral consequences flowing from an erroneous sentencing enhancement. *238 192 F.3d at 293-94. In declining to do so, the court, first, described the reasoning of Sibron as follows:
This presumption of collateral consequences has been justified on the theory that "most criminal convictions do in fact entail adverse collateral legal consequences,” Sibron[, 392 U.S. at 55, 88 S.Ct. 1889], in that convicted criminals often face certain "civil disabilities” as a result of their conviction[,] Lane[, 455 U.S. at 632 n.13, 102 S.Ct. 1322;] ... such [as] being "barred from holding certain offices, voting in state elections, and serving as a juror.” Id.
Id. at 293. The court then observed that Spencer declined to apply the presumption because "parole revocations do not ordinarily result in the sort of civil disabilities that justify the presumption when dealing with a criminal conviction.” I'd., Finally, the court, analogizing to the case before it, declined to apply a presumption of such consequences in the context of sentencing enhancements. Other circuit courts have understood the methodology of Spencer similarly, and have engaged in the precise ex ante determination I outline herein to determine whether to extend the presumption to other categories of judgment. See Gul v. Obama, 652 F.3d 12, 17 (D.C. Cir. 2011) (declining to presume that collateral consequences flow from detention at Guantanamo Bay and designation as an enemy combatant, as there is "no basis for inferring [such designations] routinely have collateral consequences”); Beachemv. Schriro, 141 F.3d 1292, 1294 (8th Cir. 1998) (declining to presume collateral consequences both because Spencer's criticism of such a presumption cautioned against extending it, and because "it is improbable that the [challenged] parole will adversely affect [the petitioner]”).

. I do not read the majority to disagree with this factual premise, see, e.g., Maj. Op. at 222 ' (observing that "[bjecause Nowakowski’s conviction was based on one of the lowest level offenses under state law, we think it is likely that he will suffer fewer collateral consequences than if convicted of a felony or even a misdemeanor”), which case law also reflects, see Meister v. N.Y. State Att'y Gen., No. 06-CV-0090(RJA)(VEB), 2007 U.S. Dist. LEXIS 98605, at *15 (W.D.N.Y. MJ. Sept. 6, 2007), adopted by Meister v. N.Y. State Atty’ Gen., 2007 U.S. Dist. LEXIS 98037 (W.D.N.Y. Sept. 26, 2007) (“In this Court’s view, [the petitioner’s] conviction for a 'violation' [in New York] — a less serious offense than a ‘misdemeanor’ — ... cannot cause him the kind of civil disabilities identified in Spencer.")-, cf. Gentry v. Deuth, 456 F.3d 687, 694-95 (6th Cir. 2006) (”[T]he law does not require a habeas petitioner to prove ... that she may face collateral consequences of her ... felony conviction, for the disabilities consequent to a felony conviction are legion, and patently obvious in many cases” (citing Spencer, 523 U.S. at 8, 118 S.Ct. 978)); Broughton, 717 F.2d at 149 (finding that a petition challenging a misdemeanor conviction was moot upon completion of sentence because the conviction would not, inter alia, "prevent [the petitioner] from voting, serving on a jury, obtaining a license to practice law, becoming an official of a labor union, or qualifying for state elective office, ... [n]or ... expose her to the possibility of an enhanced sentence if she commits a later criminal act” (citations omitted)).

. I do not mean to suggest that there is no possibility that a petitioner could face a federal sentencing enhancement on the basis of a violation-level offense generally, or Nowakow-ski’s violation, specifically. But in assessing whether a presumption is appropriate, it bears pointing out that under the federal Sentencing Guidelines, certain petty offenses are generally excluded from calculating a criminal history. See U.S.S.G. §4A1.2(c)(l) (“Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to an instant offense[.]”); see also United States v. Morales, 239 F.3d 113, 118-20 (2d Cir. 2000) (discussing second-degree harassment specifically). There is thus little question that the risk of a statutory sentencing enhancement for the vast majority of such offenses is nonexistent.

. Thus, it seems unlikely a prosecutor would attempt to impeach a future defendant for unlawfully putting up posters on private property see N.Y. Penal Law § 145.30, or that a court would generally permit impeachment even with an adjudication of second-degree harassment. The New York Court of Appeals has made clear that evidence of an offense must in fact bear “logically and reasonably on the issue of credibility,” and that some convictions are far more likely to bear on that issue than others — of which harassment in the second degree (and most violation-level offenses) would appear logically to be in the latter category. People v. Sandoval, 34 N.Y.2d 371, 376-77, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974) (noting that “[t]he commission of an act of impulsive violence ... will seldom have any logical bearing on the defendant's credibility, veracity, or honesty ... [in contrast to] crimes or acts of individual dishonesty, or untrustworthiness”). The majority is correct that there is some risk that numerous prior bad acts could be used to impeach a defendant in New York — indeed, whether or not he is convicted of a crime as a result of that act. See id. at 376, 357 N.Y.S.2d 849, 314 N.E.2d 413 (referring to admission of "[e]vi-dence of prior specific criminal, vicious, or immoral conduct”). By the majority's reasoning, however (which deems this possibility alone sufficient to raise a presumption), Spencer itself should likely have come out the other way.

.Though Spencer analyzed the risk of impeachment in the context of assessing the specific harms cited by the petitioner therein (rather than in the context of a categorical assessment of whether a presumption should apply), its analysis makes evident that parole' revocations generally do entail some risk of impeachment — certainly no less than a violation — and that this is not enough to satisfy Article Ill's case or controversy requirement, generally, or to support a presumption that such requirement has been met in the context of a specific category of judgment. See Spencer, 523 U.S. at 15-16, 118 S.Ct. 978.

.The majority is able to downplay the significance of New York’s own designation of its offense as something other than a "crime” by resolving this case through invocation of doctrine formulated in a largely inapposite context. See Maj. Op. at 218-22. New York's classification of such violations as non-criminal, however' — a classification that New York reflects in numerous ways throughout its statutory regime, see, e.g., N.Y. Crim. Proc. Law § 160.55 (sealing various records of such convictions as well as arrests that may have initially been for offenses actually designated "crimes”), and that is reflected in how various court decisions discuss such violations, see, e.g., Rigon v. City of New York, 2012 WL 2125989, at *1 (S.D.N.Y. June 12, 2012) (referring to a violation as a "non-criminal offense”) — while not dispositive whether violations are criminal for purposes of certain enumerated constitutional protections, is plainly relevant to whether such convictions are likely to entail significant collateral consequences as a categorical matter, cf. AM. v. Butler, 360 F.3d 787, 802-03 (7th Cir. 2004) (Easterbrook, J., dissenting) (suggesting that a juvenile adjudication is not a "crime” for purposes of the Sibron presumption, and in particular noting that "Illinois calls it an 'adjudication' precisely so that later in life persons who violated the law can say 'no' to the question 'have you ever been convicted of a crime?' ”).

. The majority derides my focus on the likelihood of collateral consequences flowing from a category of judgment as ‘‘Minority Report-like,” Maj. Op. at 227 n.24, but of course such an approach is routine in the context of standing and mootness inquiries, as delineation between likely and unlikely injuries, however difficult, is essential to maintaining the limitations on the jurisdiction of federal courts, see, e.g., Spencer, 523 U.S. at 14, 118 S.Ct. 978 (referring to the use of a parole revocation in a future parole proceeding as "a possibility rather than a certainty or even a probability”).

. The majority criticizes my approach to this inquiry, in particular suggesting that the presumption would be meaningless if we required every petitioner to demonstrate that "collateral consequences generally flow from [his] conviction before” affording him the benefit of "a presumption that assumes, as a first step subject to rebuttal, that collateral consequences generally flow from [his] conviction.” Maj. Op. at 227. This criticism misstates the nature of my approach. I am not proposing a new step in mootness analysis, whereby every petitioner, including those challenging a category of judgment to which the Court has previously held a presumption to be justified, must individually prove a presumption applies. I am simply engaging in the *241 ex ante inquiry that the majority elides: determining whether extension of the presumption to a new category of judgment would be consistent with our obligations under Article III. This approach, far from novel, is the very process for determining whether a presumption should apply to a new category of judgment that the Supreme Court itself employs. See Spencer, 523 U.S. at 12, 118 S.Ct. 978 (declining to extend the presumption to parole revocations because they are not likely to entail significant collateral consequences); see also Mercurris, 192 F.3d at 293-94 (using the same methodology in declining to apply the presumption to sentencing enhancements); Gul, 652 F.3d at 17 (using the same reasoning to not apply a presumption to designations as an enemy combatant). Indeed, in skipping this step altogether, it is the majority who is begging the question: the majority would require federal courts to presume a violation-level offense entails significant collateral consequences without once asking whether such a presumption in any sense comports with reality.

. The Sixth Amendment further provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” The evolution of this right, too, is instructive. In Gideon v. Wainwright, announcing the right to state-provided counsel for indigent defendants in the context of an appeal from a state felony conviction, the Court observed without qualification that "[t]his noble ideal [of a system of fair trials] cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.” 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); see also id. at 348, 83 S.Ct. 792 (Clark, /., concurring) ("That the Sixth Amendment requires appointment of counsel in 'all criminal prosecutions’ is clear, both from the language of the Amendment and from this Court's interpretation.”). Nevertheless, the Court subsequently qualified that right, ultimately concluding that it did not apply in the context of all state criminal prosecutions. See Scott, 440 U.S. at 373-74, 99 S.Ct. 1158 ("We ... hold that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of -imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense.”). Indeed, in Scott, the Court specifically noted that the project of extending its precedent was challenging, in part because of the difficulty of determining how and whether seemingly broad holdings might apply to petty offenses. See id. at 372, 99 S.Ct. 1158 (observing that locating a "constitutional line” was challenging, in part because "[t]he range of human *243 conduct regulated by state criminal laws is much broader than that of the federal criminal laws, particularly on the ‘petty’ offense part of the spectrum”). In light of this "range of human conduct,” the Court hesitated to simply "extrapolate” from prior decisions: "[A]lthough the general nature of the principle sought to be applied [in such decisions may be] clear, its precise limits and their ramifications become less so.” Id. After noting that the Sixth Amendment’s text was not instructive, see id. ("We have now in our decided cases departed from the literal meaning of the Sixth Amendment.”), the Court held that a line between "actual imprisonment ... [and] fines or the mere threat of imprisonment ... is eminently sound and warrants adoption.” Id. at.373, 99 S.Ct. 1158.

. As the majority observes, the overwhelming majority of courts have held that the presumption is rebuttable. See Maj. Op. at-. Such courts have also held on numerous occasions that the Government successfully rebutted the presumption in the context of low-level judgments that entailed similar — if not always identical — consequences to the judgment in this case. See e.g., Puchner v. Kruziki, 111 F.3d 541, 543 (7th Cir. 1997) (“We need not finally resolve whether a judgment of civil contempt is the kind of 'conviction' contemplated by the collateral consequences rule, however, because it is clear that Puchner’s contempt order did not carry the kind of collateral consequences that allow him to escape mootness now that he is released.”); Meister, 2007 U.S. Dist. LEXIS 98605, at *16 (recommending, after assessing the consequences that could flow from a violation-level conviction, that the court hold that "any presumption in favor of collateral consequences” that might apply to a violation-level conviction in New York "has been overcome” by the Government); United States v. Hill, 171 F.Supp.2d 1032, 1038, (D.S.D. 2001) (noting that a conviction for a "misdemeanor offense! ] does not cause ... the kinds of concrete disadvantages or disabilities that have been recognized as being sufficiently adverse collateral consequences to make [a] case justi-ciable,” and thus that "the presumption in favor of finding collateral consequences has been overcome”).

. Scholars analyzing Sibron in its immediate aftermath made precisely this point — that, taken literally, this single sentence the majority lifts for its standard of proof would suggest that the presumption is indeed irrebuttable— even as other statements in Sibron imply that this is not so. See Mootness in Criminal Cases, The Supreme Court, 1967 Term, 82 Harv. L.Rev. 63, 297-98 (1968) ("Given the existence of legal disabilities for convicted criminals in at least some states, a defendant's conviction would always seem to entail the possibility that he will sometime in the future suffer such disabilities.”). Only one circuit has held that the presumption is irrebuttable, see Chacon, 36 F.3d at 1463, and that decision has garnered criticism within the Ninth Circuit that is instructive in this case, see Larche, 53 F.3d at 1069-70 (arguing that the Chacon panel's determinations that the presumption applied to misdemeanors, and was irrebutta-ble, together "completely eliminat[ed] the mootness doctrine from habeas cases,” and thereby "ignored the constitutional underpinnings of the mootness doctrine, and the traditional role of the Great Writ”).

. Though it is true that the risk of impeachment, generally, may have been cited in some of the Sibron-line cases, the actual risk in this case — understood in light of the nature of Nowakowski's conviction — is simply not “a consequence significant enough to have been accepted by the Supreme Court in the past.” Maj. Op. at 228.

. I note, finally, that the majority declines to decide whether the actual consequence No-wakowski cited — the effect of his extant conviction on his pursuit of damages via 42 U.S.C. § 1983 — is sufficient to make this case justiciable. See Maj. Op at 226 n.22. My disposition of the case necessitates reaching this question, and I would hold that it does not. Justice Scalia, writing for eight justices in Spencer, referred to this consequence as "a great non sequitur, unless one believes (as we do not) that a § 1983 action for damages must always and everywhere be available.” 523 U.S. at 17, 118 S.Ct. 978. It is true that Justice Souter, writing for four justices, made clear his belief that Heck would pose no bar in any subsequent § 1983 suit. See id. at 21, 118 S.Ct. 978 (Souter, J., concurring); see also id. at 19, 118 S.Ct. 978 (noting that if Heck did pose a bar, that "would provide a reason, whether or not dispositive, to recognize continuing standing to litigate his habeas claim”). Yet, Justice Souter also observed that he "joinfed] the Court's opinion as well as the judgment,” and specified that he joined that opinion for "an added reason that the Court does not reach” — that the Heck bar would not be present. See id. at 18, 118 S.Ct. 978 (emphasis added). Thus, even if there was a division on the Court as to whether a Heck bar would limit relief in a subsequent § 1983 action, a firm majority agreed that the question did not impact the justiciability of Spencer's petition. The alternative view would suggest that Justice Souter and three other justices joined two incompatible opinions — a majority opinion that expressly did not decide whether a Heck bar existed (or assumed that it did), and thus grounded its reasoning on the irrelevance of that bar — and a concurrence that decided no Heck bar existed and then grounded its conclusion on the non-existence of that *247 bar. Other courts have reached a similar conclusion. See United States v. Duelos, 382 F.3d 62, 67 (1st Cir. 2004); United States v. Clark, 193 F.3d 845, 848 (5th Cir. 1999); see also McClendon v. Trigg, 79 F.3d 557, 559 (7th Cir. 1996) (finding that the potential of a Heck bar was insufficient to prevent mootness after the petitioner passed away — though the family argued that it would be barred from pursuing a § 1983 claim absent habeas); cf. Diamond v. Charles, 476 U.S. 54, 70, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (holding that "the mere fact that continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under Art. III”).

. I do not read the majority as holding that conditional discharge itself — irrespective of the specific condition attached to it — adds any material severity to a restraint on liberty for purposes of our analysis. See N.Y. Penal Law § 65.05(2) (“[Wjhen the court imposes a sentence of conditional discharge the defendant shall be released with respect to the conviction for which the sentence is imposed without imprisonment or probation supervision but subject, during the period of conditional discharge, to such conditions as the court may determine.” (emphases added)); Nor would such a conclusion make sense. First, though a sentencing court “may modify or enlarge the conditions [of conditional discharge],” id. (emphasis added), no such modification occurred here, and there is no reason to believe that in the ordinary case the risk of modification (coupled with the risk that the modification will result in greater restraints, rather than equal or even lesser ’ones) is a significant one, see, e.g., People v. Stefanello, 195 Misc.2d 262, 264, 757 N.Y.S.2d 701 (N.Y. Cty. Ct. Ontario Cty. 2003) (observing that "[depending on the 'circumstances, particularly the offender’s conduct, the sentence may be modified or revoked entirely and a new sentence imposed” (emphasis added)). Second, the restriction that Nowakowski not commit an additional offense (or risk revocation of his conditional discharge) does not constitute a "restraint[] not shared by the public generally.” Jones v. Cunningham, 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). And finally, a contrary determination might have the effect of elevating conditions courts have held insufficient to constitute custody above their stature. Compare, e.g., People v. Pabon, 119 A.D.2d 446, 446, 500 N.Y.S.2d 132 (N.Y. App. Div. 1st Dep’t 1986) (assessing a sentence in which the sole condition was that the defendant could not reapply for a driver’s license); with Lillios v. New Hampshire, 788 F.2d 60, 61 (1st Cir. 1986) (per curiam) (holding that suspension of a driver’s license was not a sufficient deprivation of liberty to render a defendant in custody).

. See Jones, 371 U.S. at 242, 83 S.Ct. 373 (holding parole supervision to be custody); Hensley, 411 U.S. at 351, 93 S.Ct. 1571 (finding custody where petitioner’s "freedom of movement rest[ed] in the hands of state judicial . officers, who_ [could] demand his presence at any time and without a moment’s notice”; where he was free from "incarceration” only by virtue of a stay; and where he faced the imminent threat of future incarceration); Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (finding custody, in the context of a Double Jeopardy case, where the petitioner faced "[the] obligation to appear for trial in *248 the jury session on the scheduled day and also 'at any subsequent time to which the case may be continued' ” (quoting Mass.Gen.Laws Ann., ch. 278, § 18 (West 1981)); the requirement to "not depart without leave” (quoting id.); and the imminent threat of two years’ incarceration should he fail to appear at the trial); Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 895 (2d Cir. 1996) (finding the threat of permanent banishment from a reservation sufficient to render the petitioners in custody); compare Shenandoah v. U.S. Dep’t of Interior, 159 F.3d 708, 714 (2d Cir. 1998) (finding the petitioners not in custody where they alleged, inter alia, that they had been "denied admittance into the Nation's health center, ... [and] banned from various businesses and recreational facilities”); see also Poodry, 85 F.3d at 895 (suggesting that the placement of a penalty in the hierarchy of a state's penalty-scheme is relevant to its severity). Further, the majority's conclusion that duration is in all cases irrelevant to the level of severity imposed by a penalty, see Maj. Op. at 216, does not seem obvious. Indeed, it may be that at times one must recognize duration to fully understand the severity of a restriction on liberty. See, e.g., Poodry, 85 F.3d at 895 (discussing permanent banishment); see also Lydon, 466 U.S. at 301, 104 S.Ct. 1805 (noting that the petitioner was "under an obligation to appear for trial in the jury session on the scheduled day and also 'at any subsequent time to which the case may be continued' ” (quoting Mass.Gen.Laws Ann., ch. 278, § 18 (West 1981))(emphasis added)).